```
 1              IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3

    ESTATE OF ROSHAD MCINTOSH DECEASED,  ) Docket No. 15 C 1920
 4  BY CYNTHIA LANE, ADMINISTRATOR,      )
                                         )
 5                      Plaintiff,       )
                                         )
 6           vs.                         )
                                         )
 7  CITY OF CHICAGO, et al.,             ) Chicago, Illinois
                                         ) March 30, 2017
 8                      Defendants.      ) 9:15 o'clock a.m.

 9

10              TRANSCRIPT OF PROCEEDINGS - MOTION
              BEFORE THE HONORABLE AMY J. ST. EVE
11

    APPEARANCES:
12

13  For the Plaintiff:      ODIM LAW OFFICES
                            BY:  MR. CARLTON E. ODIM
14                          225 W. Washington St., Suite 2200
                            Chicago, Illinois  60606
15
                            ACTION INJURY LAW GROUP, LLC
16                          BY:  MR. ANDREW M. STROTH
                            191 North Wacker Dr. Suite 2300
17                          Chicago, Illinois  60606

18
    For Deft. City of       ROCK, FUSCO & CONNELLY, LLC
19  Chicago:                BY:  MS. EILEEN E. ROSEN
                                 MR. PATRICK R. MORAN
20                          321 North Clark Street, Suite 2200
                            Chicago, Illinois  60654
21

22  For Defts. Zodo,        CITY OF CHICAGO, DEPARTMENT OF LAW
    Slechter and Bowery:    BY:  MR. JASON M. MARX
23                          30 N. LaSalle Street, Suite 900
                            Chicago, Illinois  60602
24

25
```

```
1   APPEARANCES (Cont'd):

2
    For Deft. Sampim:           BORKAN & SCAHILL, LTD.
3                               BY:  MS. WHITNEY N. HUTCHINSON
                                20 South Clark Street, Suite 1700
4                               Chicago, Illinois 60606

5
    Court Reporter:             MR. JOSEPH RICKHOFF
6                               Official Court Reporter
                                219 S. Dearborn St., Suite 1232
7                               Chicago, Illinois  60604
                                (312) 435-5562
8

9               *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

10                     PROCEEDINGS RECORDED BY
                       MECHANICAL STENOGRAPHY
11              TRANSCRIPT PRODUCED BY COMPUTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE CLERK:  Recall 15 C 1920, Lane vs. City of

2   Chicago.

3          MS. HUTCHINSON:  Good morning, your Honor, Whitney

4   Hutchinson on behalf of Officer Sampim.

5          THE COURT:  Good morning.

6          MS. HUTCHINSON:  Good morning.

7          MR. ODIM:  Good morning, your Honor, Carlton Odim,

8   O-d-i-m, on behalf of the plaintiffs.

9          THE COURT:  Good morning, Mr. Odim.

10          MR. MORAN:  Good morning, Judge, Pat Moran on behalf

11   of the City.

12          MS. ROSEN:  Good morning, your Honor, Eileen Rosen on

13   behalf of the City.

14          THE COURT:  Good morning.

15          You are here for status and, in particular, for

16   status on the plaintiff's second reissued Rule 30(b)(6) notice

17   of videotaped depositions.

18          You were going to attempt to talk and see if you

19   could narrow the issues for the Court or reach total agreement

20   on the 30(b)(6) issues.  I am hoping you have done that; and,

21   if so, where are you on narrowing the issues?

22          MR. MORAN:  So, Judge, we did -- we sent them a

23   letter.  We had a sit-down, two-hour meeting this week.  We

24   did come to agreement on one of the paragraphs.  So, the

25   plaintiff has agreed to withdraw No. 3.

```
 1              THE COURT:  That is not very helpful, but --
 2              MR. MORAN:  Yeah.
 3              So, setting that point aside, I did, after that
 4     meeting, submit an e-mail proposal on how the City viewed what
 5     30(b)(6) -- or how it could be narrowed.  And I have a copy of
 6     that proposal --
 7              THE COURT:  Have you spoken with Mr. Odim since?
 8              MR. MORAN:  Yes.
 9              MR. ODIM:  Yes.  Yes, we spoke yesterday about that.
10              THE COURT:  Have you reached any agreement on that
11     e-mail?
12              MR. MORAN:  We have not.  But I have a copy of it.  I
13     have a copy for you and --
14              THE COURT:  Okay.
15              MR. MORAN:  -- have one, so if you want me to send it
16     up there real quick.
17         (Document tendered to Court.)
18              MR. MORAN:  Do you have the 30(b)(6), as well?
19              THE COURT:  I am sorry?
20              MR. MORAN:  Do you have the notice, as well?  The
21     30(b)(6)?
22              THE COURT:  I do.
23              I assume it is the same one that you provided to the
24     Court --
25              MR. ODIM:  Yes, it is the same one.
```

1          THE COURT:  -- the last time you were here.

2          MR. ODIM:  Yes.

3          THE COURT:  All right.  So, let's go through these

4 one by one.

5          MR. MORAN:  Well, just before we get into that,

6 Judge, you'll see that we kind of narrowed it by shootings

7 versus other types of issues.  And the reason for that is the

8 complaint itself is --

9          THE COURT:  That makes sense.

10          MR. MORAN:  -- hyper-focused.

11          THE COURT:  That was one of the questions I had

12 because the 30(b)(6)'s are broad with respect to use of force,

13 which could cover a lot of different issues.  And you include

14 in parentheses, "including the discharge of firearms."

15          But why are you entitled to a 30(b)(6) on the broader

16 use of excessive force, which would cover a lot of other

17 issues that, from my reading -- and I re-reviewed the

18 complaint this morning before I came in -- do not seem to be

19 at issue here?

20          MR. ODIM:  Well, the one thing that the City and the

21 plaintiffs agree on is that the method or the scope of the

22 DOJ's investigation is exactly what is in the complaint

23 presented to the Court.  The defendants argued in their

24 motion -- renewed motion -- to bifurcate at Docket 112 -- and

25 I am quoting them -- "The focus of the DOJ's investigation

1  covers the exact same ground plaintiff identified as the core

2  foundation of her own Monell claim."

3          So, if the plaintiff is forced to pare down her

4  30(b)(6) inquiry, at a minimum the plaintiff will not be able

5  to anticipate and prepare for the City's defense.

6          THE COURT:  What is the defense going to be?

7          I am going to go through these very specifically, but

8  my question is specific as to the broad category of requests

9  pertaining to the use of excessive force versus the use of the

10 discharge of firearms --

11         MR. ODIM:  Okay.

12         THE COURT:  -- at civilians.

13         MR. ODIM:  Let me --

14         THE COURT:  You are clearly entitled to the second

15 because that is the focus of your complaint.

16         MR. ODIM:  Let me --

17         THE COURT:  But I do not see any allegations in your

18 complaint with respect to the use of excessive force in

19 general.

20         To the extent that the City's policies with respect

21 to excessive force and the use of firearms overlap, you would

22 get them because the discharge of firearms is clearly --

23         MR. ODIM:  Well --

24         THE COURT:  -- relevant.

25         MR. ODIM:  -- let me address this directly.

1          THE COURT:  Please.

2          MR. ODIM:  The question in my -- I think the

3   distinction between shooting at other is not relevant to the

4   relevance standard for the 30(b)(6); that a related question

5   implied in the complaint is:  What would not have been

6   excessive force?  What force would have been rele- -- what

7   force would have been necessary and satisfactory and

8   appropriate in handling the incident that the officer

9   confronted?

10         And our argument is that that force was less than

11  deadly force and was non-shooting force.

12         So, it is -- that --

13         THE COURT:  But you do not allege anything about

14  force being used other than the discharge of the firearms.

15  And if your argument is that -- and I think it is -- is that

16  something used less than a shooting or the discharge of a

17  firearm was appropriate here, that is covered.  You know, what

18  that something less was was not alleged to have been used in

19  the first place.  It was a discharge of firearms.

20         MR. ODIM:  Well, if I'm not misunderstanding the

21  distinction the Court is making, I think the Court is saying

22  that there's a shadow thrown away from the shooting that would

23  encompass the implied issue that I have described.  That is,

24  was there some force less than shooting force which was

25  appropriate in this particular instance?

1          THE COURT:  I am not saying that.

2          I am saying based on your allegations in the

3     complaint -- and this was filed in 2015 -- based on what has

4     been asserted, what is at issue is the alleged

5     unconstitutional discharge of a firearm at a civilian.  There

6     is no other excessive force.  There is not a claim that he was

7     handcuffed and they were too tight.  There is not a claim he

8     was thrown to the ground inappropriately.  There is not a

9     claim he was punched.  There is not a claim he was beaten up.

10    All the other excessive force allegations that you see in

11    other cases, those are not in here.

12          What is at issue is something more extreme, but it is

13    the discharge of firearms.

14          Mr. Moran, do you want to respond to his comments?

15          MR. MORAN:  Well, Judge, it's actually -- when we

16    focus on the incident itself, we're talking about a binary

17    choice here:  Lethal force or none.

18          And this is the first sentence from the complaint:

19    The Chicago police officer brazenly shot an unarmed

20    19-year-old Roshad McIntosh.

21          If he's unarmed and he's giving up in the moment this

22    occurs, there's no force that's justified other than maybe

23    handcuffing him and taking him in.  So, we're not talking

24    about the broad range of force here.  It's either lethal force

25    or none.

1          And that's how the entire complaint is set up.  The

2    complaint goes through statistical analysis of shootings and

3    discipline.

4          THE COURT:  Right.

5          MR. MORAN:  I mean, you already know all that.

6          THE COURT:  I read it.

7          I am granting the City's request to narrow the

8    30(b)(6) topics to the use of firearms and lethal force -- use

9    of firearms in general and lethal force -- but taking out the

10   broad category of any kind of excessive force, because that

11   just goes way beyond what is at issue here.  And what is at

12   issue in the DOJ complaint and DOJ's investigation, that is

13   not relevant to what you are alleging in your complaint.

14         So, let's go through these one by one.  And when the

15   marshals come down, I am going to take a break because they

16   are way behind schedule now.  When the marshals come down, we

17   will take a break, but we will pick back up and finish up.

18         So, No. 1, is there any objection, I guess, to all of

19   these, the time frame, 2009 to 2015?

20         MR. MORAN:  We had initially -- the original

21   discovery plan on Monell discovery was a five-year period.

22   And I think that's actually one of the small areas we did

23   agree on.

24         THE COURT:  Okay.

25         So, did you --

1          MR. ODIM:  I asked for where that was stated, and I

2     never got a response back.  So, he has the advantage of --

3          MR. MORAN:  Institutional knowledge.

4          MR. ODIM:  -- being able to point that out to me, and

5     he hasn't done so.

6          MR. MORAN:  That one fell by the wayside, Judge.  I

7     don't actually have it with me.  It's my recollection.  But I

8     can't -- I mean, let me --

9          MR. ODIM:  If it is, in fact, what has happened, I'm

10    not going to push up against that.  So, I think that's

11    something that we can verify offline.

12         MR. MORAN:  But assuming it's not anywhere to be

13    found, our position would be that it should be five years and

14    not seven years.

15         THE COURT:  It sounds like there is no objection to

16    that.  I am trying to go back and see if I have it in my notes

17    anywhere.  I am not sure that -- I do not recall that issue

18    being raised in court.

19         MR. MORAN:  It came up in connection with producing

20    all of the other investigations related to police shootings.

21    So, the City initially had objected to producing a seven-year

22    period.  And I think the consensus at the time for the

23    document production was that the City could produce a

24    five-year period.

25         THE COURT:  Okay.  You are an officer of the Court.

1    I will accept that representation, and we will do the

2    five-year period.

3              Was it 2010?

4              MR. MORAN:  I think it would be 2011 to 2015.

5              THE COURT:  Okay.  So, we will --

6              MR. ODIM:  Can I still verify that?  Because I think

7    --

8              THE COURT:  Yes.

9              MR. ODIM:  -- the period is appropriate as written,

10   seven years.

11             THE COURT:  If you can find where that agreement was

12   --

13             MR. MORAN:  Sure.

14             THE COURT:  -- or something reflecting that.

15             I do not think, again, it was something that I

16   addressed.  It sounds like it is something that you agreed on.

17   So, assuming that agreement was there, we will do 2011 through

18   2015.  That will impact each of these requests.

19             So, No. 1, policies, practices and/or customs about

20   the discharge of firearms at civilians from 2011 to 2015, and

21   then you have various subparts.

22             The use of force against fleeing suspects, I assume

23   there is no objection to that?

24             MR. MORAN:  No.

25             THE COURT:  Because based on the complaint, that

1 seems to --

2          MR. MORAN:  It would encompass shootings at citizens.

3 So, I mean, if they're fleeing or not fleeing really makes no

4 difference.

5          THE COURT:  Yes.

6          The force against suspects fleeing in vehicles, what

7 is the relevance of that?

8          I guess, are you objecting to that?

9          I did not see any kind of allegation that anybody was

10 in a vehicle here.

11          MR. ODIM:  Again, it's still -- again, if we are

12 narrowing it to shooting, it's still a shooting.  And I think

13 that it's relevant.

14          THE COURT:  That does not make it relevant, though.

15          MR. ODIM:  Well --

16          MR. MORAN:  And there are different policies related

17 to suspects fleeing in a vehicle because someone fleeing on

18 foot is simply fleeing on foot.  They're not a dan- -- the

19 fact that they're running away isn't a danger.  A car itself

20 is a weapon.

21          THE COURT:  Right.

22          MR. MORAN:  So, that changes the dynamic completely.

23          THE COURT:  Yes.

24          MR. ODIM:  We have a case in which a person was

25 fleeing on foot and jumped into a car and took off.  So --

1          THE COURT:  Well, maybe in that case you will get

2    that discovery.  But this case --

3          MR. ODIM:  We'll try that case here.

4          THE COURT:  -- cannot be used to get discovery in

5    that case.

6          I am going to sustain the City's objection to 1(b).

7    The use of force against suspects fleeing on foot, that seems

8    similar to (a).  I cannot believe there is an objection to

9    that.

10          MR. MORAN:  There isn't.

11          THE COURT:  And then (d), use of force.  And by "use

12    of force," again, it is the narrowed shooting against suspects

13    who are not fleeing.

14          I cannot believe there is an objection to that.

15          MR. MORAN:  Right.  There isn't.

16          THE COURT:  And then (e), you have (e) language in

17    most of your requests.  And I was not sure I quite understood

18    what you were looking for.

19          I guess the first question is, Mr. Moran, is there an

20    objection to 1(e)?

21          MR. MORAN:  We did object, Judge, because it's so

22    broad it would encompass any review of any policy related to

23    the use of force.

24          So, we circumscribed it to the City's review of

25    policies, practice and customs with respect to police

1    shootings and police shootings involving suspects fleeing on

2    foot.

3              THE COURT:  Yes, this is so -- and that is the

4    trouble I was struggling with because it is so, so broad.

5              So, what is it you are looking for?

6              MR. ODIM:  I am looking for the City's institutional

7    knowledge.

8              THE COURT:  Of?

9              MR. ODIM:  Of -- well, now that the Court has

10   narrowed this to shootings, I mean, I would say that these

11   policy, practice and customs categories would go to that

12   issue.

13             But how do I ask about its knowledge of its policies

14   and practices without asking them?  I want to make sure that

15   someone is designated and committing the City to its knowledge

16   about those issues.  Not just about the discrete use of force

17   against fleeing suspects, for instance.  What's the City's

18   policy?  How does it review it?  How does it arrive at the

19   policy?  Has the policy changed over the period?

20             THE COURT:  But if the policy, as I have already

21   narrowed it, is to the City's use and discharge of firearms at

22   civilians, whether they are fleeing or not, what is it that

23   you are looking for beyond that?

24             MR. ODIM:  The customs.  Do they follow the written

25   policy?  What's the practice that is not in a written policy?

1          THE COURT:  Okay.  I think we are saying the same

2    thing, then.

3          So, if it is modified to say the City's review of and

4    modification of its policies, practices and customs with

5    respect to police shootings and police shootings involving

6    suspects fleeing on foot, I think that covers what you are

7    seeking.

8          MR. ODIM:  I think so.

9          THE COURT:  Okay.

10          MR. ODIM:  I think that's the same thing.

11          MR. MORAN:  That's actually what we had written.

12          THE COURT:  Almost.  I added after "review and

13    modification" because that captures everything.

14          Okay.  So, that is No. 1.

15          No. 2 -- one second, please.

16      (Brief pause.)

17          THE COURT:  Keep going.

18          MR. ODIM:  It probably goes without saying, but I

19    want to say it just to make sure, that we're not here talking

20    about just written policies.

21          THE COURT:  No.

22          MR. ODIM:  We're talking about --

23          THE COURT:  Customs, practices --

24          MR. ODIM:  -- customs, practices, written, unwritten.

25          THE COURT:  That is in the -- yes.

1          MR. ODIM:  Okay.

2          THE COURT:  It does not specify written, and it

3     includes policies, which would certainly include written;

4     practices and customs, which would not be limited to written.

5          MR. ODIM:  So, I take it, then, that reconfiguration

6     of (e) would apply through the --

7          THE COURT:  Yes.

8          MR. ODIM:  -- the other topics?

9          THE COURT:  Yes.  Unless there is -- if there is one

10     that you think it should not, let me know.

11          MR. ODIM:  Okay.

12          THE COURT:  But, yes, I do not see why that would be

13     any different on any of the other ones.  But as we go through

14     these individually, let me know.

15          MR. MORAN:  So, Judge, with No. 2, we narrowed it

16     almost in the same way that you just discussed with No. 1; in

17     that, it's on the documenting, reviewing and investigating of

18     police shootings, review of its policies, practice and customs

19     -- and we would add "modification" -- with respect to

20     documentation and review of police shootings.

21          THE COURT:  I am just trying to make sure we get -- I

22     think that would cover everything, Mr. Odim.  That would

23     actually give you more than -- oh, you are asking for less --

24          MR. ODIM:  Less than -- yeah.

25          THE COURT:  Yes.  But that would be all shootings,

```
 1    not just ones resulting in death.  So, that -- I agree with
 2    that modification.
 3            So, No. 2 should be modified to:  "A deponent to
 4    testify about the policies, practices and/or customs for:
 5    One, documenting, reviewing -- " I am adding "reporting,"
 6    which should -- it may or may not be encompassed in
 7    "documenting," but I do not want "documenting" too narrow
 8    " -- and investigating police shootings; and, two, the City's
 9    review of and modification of its policies, practices and
10    customs with respect to documentation and review of police
11    shootings."
12            MR. MORAN:  That will do it for the City.
13            THE COURT:  I am going to add at the end there, with
14    respect to documentation, "reporting and review of police
15    shootings."
16            So, that gives you what I think you are seeking,
17    Mr. Odim, and what is relevant to your case.
18            So, 3 you have agreed to withdraw.
19            4, same modification with respect to discharge of
20    firearms.  Same modification to (e).  This pertains to
21    misconduct allegations being filed and investigations through
22    mediation.
23            I was not sure from your complaint, Mr. Odim, if a
24    complaint was filed here against the police officers.
25            MR. ODIM:  I will withdraw (d).
```

1              THE COURT:  Okay.

2              5 -- oh, (d).  I am sorry.  So, you are withdrawing

3     (d).

4              And how does that compare, then, to what you have

5     proposed?

6              MR. MORAN:  So, it would be -- I think it's

7     everything you just said, Judge, with the exclusion of the

8     mediation part.  Investigating shootings, including those with

9     and without complaints of officer misconduct; review of

10    policy, practice and customs -- and your additional

11    modification language -- with respect to police shootings.

12             We did object to the use of the phrase "fully

13    investigated" versus "not fully investigated" because that is

14    a subjective phrase not easily discernible.

15             THE COURT:  I think "investigated," whether or not,

16    would give you what they have done; and, then, you have the

17    facts to make the argument that they were fully or not fully.

18    What you think was fully may not be --

19             MR. ODIM:  Yes.

20             THE COURT:  I should probably reverse it.  What they

21    think was fully, you may not think was fully.

22             MR. ODIM:  I understand.  I want -- again, I wanted

23    to be as particular as I could so that we wouldn't have this

24    pillar to post, they provide someone who comes to testify

25    about, oh, these were just investigations that had a final

1    order in it and --

2             THE COURT:  So, anything investigated would be

3    covered --

4             MR. ODIM:  Okay.

5             THE COURT:  -- by this.

6             MR. ODIM:  And any initiated investigation, however

7    it ran.

8             THE COURT:  Exactly.

9             MR. ODIM:  Yes.

10            THE COURT:  Whether it was completed or not.

11            I actually think you are better off with that --

12            MR. ODIM:  Yeah.

13            THE COURT:  -- because then they are not testifying

14   about what they think was fully.

15            MR. ODIM:  Okay.

16            THE COURT:  You get the facts to argue that.

17            So, are those modifications clear on 4?

18            MR. MORAN:  Yes.

19            MR. ODIM:  Yes.

20            THE COURT:  5.

21            Do you want to propose any modifications to this,

22   Mr. Odim?  Because it looks very broad, based on the

23   allegations.

24            For example, I do not know what role IPRA had here.

25   I did not see -- I think there may have been one IPRA

1   allegation in the complaint, but anything about coaching

2   officers or leading questions or probing questions, parallel

3   civil and criminal proceedings.

4           What are you seeking --

5           MR. ODIM:  Again --

6           THE COURT:  -- to get?

7           MR. ODIM:  -- the scope of this topic is to lay

8   the -- or set the scene for describing the environment into

9   which the City sends its police officers, including in this

10  specific case.

11          THE COURT:  To which the City sends its police

12  officers for, what?

13          MR. ODIM:  To police.

14          Again, if a police officer goes into -- gets up in

15  the morning, goes out to police, the police officer has a --

16  it's our contention, has a -- general idea about what the odds

17  are of his misbehaving or not misbehaving.  Is he going to get

18  caught?  Is he going to -- is it going to get lost in the

19  system somewhere?

20          THE COURT:  To say to police -- Question 5 is focused

21  on CPD and IPRA investigations.

22          MR. ODIM:  They're the ones that -- the police

23  know -- the individual policemen, I believe I can say it

24  without exaggerating, have an idea of what that process of

25  investigation is.

1          THE COURT:  Okay.

2          So, to say you are looking for how they go out and

3     police is not even what you have written in your Question 5.

4     I know overall that may be what you want to get from the

5     individual questions, but I am focused on Question 5.

6          MR. MORAN:  Judge, I think our proposal accomplishes

7     what the plaintiff wants without trying to dissect every

8     individual step of the investigation.  And, you know, the

9     subparagraphs here use a lot of argumentative descriptions

10    that are, you know -- we're not going to agree, you know,

11    people are colluding.  So, I mean, those things are way too

12    broad and irrelevant.

13         On No. 5, we said the City agrees to produce a

14    deponent to testify as to policy, practices or customs for

15    conducting investigations of police shootings by CPD and IPRA

16    and a review of the policies, et cetera, as we've discussed.

17    I think that's a reasonable way to go about it right now.

18         MR. ODIM:  So, if --

19         THE COURT:  Because some of these subcategories that

20    you have are very argumentative.  They may or may not be true,

21    but they're very argumentative.  Let me give you an example.

22    You want somebody from the City to testify about the coaching

23    of CPD officers by their legal representatives during an IPRA

24    investigation.  My guess is if that is your category, the way

25    you have phrased that, they are going to say it does not

1    happen; we do not have anything to answer on that.

2         But if you ask in general, how do you conduct your

3    investigations, what role do legal representatives play, those

4    are the questions you want to get at to be able to make these

5    arguments to the Court.

6         MR. ODIM:  And I suppose this ultimately is the

7    chicken and egg problem.  These categories -- these

8    subcategories are categories which I believe professionals in

9    this area, the Justice Department Civil Rights Department and

10   -- the Civil Rights Division and the U.S. Attorney's Office

11   found these subcategories relevant in arriving at their

12   conclusion that there was a pattern and practice.

13        Again, DOJ report isn't necessarily something that is

14   directly relevant to this case.  But the relevance of -- when

15   I say "directly relevant," we're not going to be standing on

16   the DOJ report.

17        But the relevance of what professionals in this area

18   think about using to support a pattern and practice allegation

19   seems to me useful.  And I wanted to be clear -- again, I can

20   ask -- we could have it generally, but if I ask this question,

21   is the City -- does the City have any knowledge -- any

22   knowledge -- institutional knowledge -- about the coaching of

23   police officers and the City says --

24        THE COURT:  During an IPRA investigation?

25        MR. ODIM:  During an IPRA investigation, right.

1          -- and the City says, no, well, I may be using -- I

2    don't know how I'll do it precisely, but I may be using the

3    investigation of the DOJ and the Chicago Police Department's

4    own policy statement issued on March 14th, which basically

5    summarizes the findings in DOJ.

6          So, we can scratch the subcategories, but I don't

7    want -- I want the City's answers when I ask them.  If they

8    don't know, say they don't know.  I'll use it against them.

9          MR. MORAN:  He can ask any question he wants at that

10   deposition --

11         MR. ODIM:  Okay.

12         MR. MORAN:  -- and we're going to object where

13   appropriate.  But, I mean, to say that the City has to produce

14   somebody with knowledge and what an individual officer's

15   attorney tells them in connection with an IPRA investigation,

16   the City can't do it because that's a privileged

17   communication.

18         So, there's no way we could ever produce someone or

19   designate someone to say, yeah, we're going to talk about how

20   to combat attorney's advice during that investigation.

21         MR. ODIM:  But that's not what I'm asking for.

22   Right?

23         THE COURT:  Okay.  So --

24         MR. ODIM:  I'm asking for the City's knowledge and if

25   they ever did an investigation in which that came up.

1          THE COURT:  I am going to modify No. 5 as proposed by

2     the City because, again, it will let you ask the questions

3     that you are getting at with respect to their policies,

4     practices and procedures regarding CPD and IPRA

5     investigations.  It is very broad.

6          So, No. 5 will be revised.  The City should produce a

7     30(b)(6) deponent to testify as to the policies, practices

8     and/or customs for conducting investigations of police

9     shootings by CPD and IPRA and the City's review and

10    modification of its policies, practices and customs for the

11    investigation of police shootings by CPD and IPRA.

12         That will get you what you are seeking to get for

13    your case.

14         So, No. 6.

15         MR. MORAN:  6 and 7, Judge, are actually related.

16         THE COURT:  I am sorry?

17         MR. MORAN:  They're related.  And both go -- I mean,

18    one talks about staffing levels at IPRA, and the other one

19    talks about completion time of investigations.  And what it --

20    and the subparagraphs all sort of point in the direction of

21    how the IPRA staffed and resourced, and I think that goes

22    beyond the complaint.

23         What the plaintiff essentially alleged is that the

24    ultimate outcome is that these shootings aren't investigated

25    or they're not investigated adequately and the officers have a

1    belief, as a result of that, that they can do whatever they

2    want.  That doesn't bring into play resourcing and staffing

3    and funding and allocation and, you know -- that kind of

4    debate is something that happens at City Council.  We would

5    have to produce people way beyond what is alleged in the

6    complaint.

7              MR. ODIM:  If the City knows that it's understaffing

8    at meetings, knows that it's understaffing, knows that it

9    needs more staff in order to complete investigations -- again,

10   it's March 14th, 2017.  The order goes to that issue.

11             The idea that somehow the individual people who are

12   designated and their knowledge is relevant to a 30(b)(6) just

13   isn't so.  It's the knowledge of the City.  It's the knowledge

14   of the City.  If the person who has knowledge is no longer

15   working for the City, the City has an obligation to go to that

16   person and collect that knowledge.

17             So, the defense tries to make this -- tries to make

18   what is relevant irrelevant.  The City's knowledge of

19   understaffing when it knows that it needs more investigators,

20   more investigators who have on-the-job training, is relevant

21   to whether they can complete investigations in a timely way

22   and their officers can expect that or not expect that.

23             THE COURT:  I am going to pass this and deal with my

24   custody cases.  Do not go away.

25             If you want to go out in the hall and try to narrow

1      these in light of the direction you have so far --

2              MR. MORAN:  Yeah, we'll do that, Judge.

3              THE COURT:  -- that would be good.

4          (The Court gave its attention to other matters, after

5      which the following proceedings were had in open court:)

6              THE COURT:  Okay.  You are back and we were on No. 6

7      and 7.  You have had time to talk.  Have you reached --

8              MR. MORAN:  Yeah, on 6 and 7 we're not going to

9      agree, Judge.

10             THE COURT:  Okay.

11             MR. MORAN:  It's the City's position that this gets

12     far afield from the allegations in the complaint into

13     staffing, resourcing of IPRA and things of that nature.

14             And one of the things that came to mind is that the

15     City has knowledge of many areas probably that are -- you

16     know, it's a government entity.  Government entities

17     traditionally are lacking in funding in a lot of areas.  So,

18     it gets into all kinds of questions about where should the

19     resources be allocated.

20             And what the plaintiff has alleged is that the

21     ultimate outcome is that there's some failure that, for

22     whatever it is, IPRA's not doing enough and officers see that

23     conclusion; the conclusion that the officers see that's

24     alleged in the complaint emboldens them.  That's according to

25     the allegations.

1        I have a hard time believing that any street-level

2   police officer walks around thinking about the fact that maybe

3   IPRA's not as well-funded as it should be and not well-staffed

4   as it should be and maybe I can get away with this because

5   my -- whatever complaint that comes out of this isn't going to

6   percolate up to the top for a long time or even get handled.

7   That just is not what is going on.

8        They're looking at the conclusion, which is that for

9   whatever reason, these investigations aren't doing enough to

10  stem officer misconduct.  So, this gets way far afield of what

11  we're talking about in this case.

12       THE COURT:  I am going to sustain the City's

13  objection without prejudice, and we can revisit it later if we

14  need to.  But I am sustaining it for now.

15       Again, based on the allegations in the complaint, I

16  agree that that does seem far afield from the focus of your

17  Monell claim.  But I will deny without prejudice.  If

18  something else comes up, we can revisit it.

19       No. 8.

20       MR. MORAN:  8 -- so, it came down to the City wants

21  it limited to the code of silence, which is alleged in the

22  complaint.  The plaintiff wants tampering of video and audio

23  and intimidation of complainants and witnesses to be included.

24  Those aren't alleged in this complaint.

25       THE COURT:  I had those highlighted for the same

1    reason.

2            MR. ODIM:  The -- apparently there's a witness here

3    which supports the police side and the police say that they

4    don't have -- they haven't been able to find him to produce

5    him for a deposition, but they have his statement.  All the

6    fact witnesses on the plaintiff's side say that they saw no

7    gun; this guy came out with his hands up.  Well, was that

8    witness -- was that one witness they have intimidated in some

9    way?  Does the City have some cross --

10           THE COURT:  Did he say, Mr. Odim, in his complaint or

11   in his statement that he was intimidated?

12           MR. MORAN:  No.

13           MR. ODIM:  I -- yeah -- say no.  But he wouldn't,

14   right?

15           THE COURT:  I thought that is what you were saying,

16   that you had --

17           MR. ODIM:  No.

18           THE COURT:  -- a witness to support this.

19           MR. ODIM:  No, no, no, no.  What I'm saying is that

20   it's not unusual to hear that the police have intimidated

21   people to give statements.  And to the extent that the City

22   engages in that practice, again, it emboldens these officers.

23           MR. MORAN:  That's another way of saying a fishing

24   expedition.

25           THE COURT:  But we are done with fact discovery here,

1  so we are -- is there any fact discovery that would support

2  your argument?

3          MR. ODIM:  No.  No, there is no fact.

4          THE COURT:  Okay.

5          MR. ODIM:  I have -- we have done none.  We have done

6  none.

7          THE COURT:  Okay.  Then I am going to modify it and

8  take out (b) and (c) and focus on the code of silence instead.

9          MR. MORAN:  And the way we've written it, Judge, in

10  the e-mail, the City agrees to produce a deponent to testify

11  to policies, practices or customs for preventing the alleged

12  code of silence by its officers.

13          I would imagine that you're also going to include

14  (d), and the review of those policies and modifications --

15          THE COURT:  Yes.

16          MR. MORAN:  -- as has been the case all along.

17          THE COURT:  And not just preventing, but the

18  existence of and the prevention of.  Because it is really the

19  existence of that is the thrust of the Monell hearing.

20          Are you okay with that modification, Mr. Odim?

21          MR. ODIM:  Yes, Judge, I -- just a second.  Sorry.  I

22  lost --

23          THE COURT:  And then (d) will be included, the City's

24  review of and modification of its policies, practices and

25  customs with respect to the code of silence.

1          MR. MORAN:  Yeah, these --

2          THE COURT:  The existence of.

3          MR. MORAN:  Yeah.

4          THE COURT:  Okay.

5          MR. MORAN:  So, then the next one is 10.

6          THE COURT:  What about 9?

7          MR. MORAN:  Oh, I'm sorry, 9.

8          THE COURT:  Did you agree on a modification?  This

9    involves discipline.

10         And it would be consistent to what we did --

11         MR. MORAN:  We did agree to 9.

12         THE COURT:  -- at the very beginning, discipline with

13   respect to shootings.

14         MR. MORAN:  So, our meeting was productive.  We did

15   agree on 9.  It will -- provided it includes also the length

16   of time for getting to the point of discipline and the

17   modification language included -- that you've been including

18   all along.

19         So, in that respect, the way we've written No. 9 is

20   accepted with those two additional points.

21         MR. ODIM:  No.  It's the way I've written No. 9

22   striking (c) and (d), leaving (a) and then using the (e)

23   language -- the (e) modification language.

24         MR. MORAN:  Okay.  So, I guess we didn't reach an

25   agreement.  I apologize for that, Judge.

```
 1              Then the City proposes that, as it's written in our
 2    e-mail, policies, practices and customs for:  (a) disciplining
 3    officers involved in improper or unlawful police shootings;
 4    (b), the City's review of its policies, practices and customs
 5    with respect to disciplining officers involved in unlawful or
 6    improper police shootings.
 7              Included in that, Judge, would be the length of time
 8    to get to discipline and the modification language "in its
 9    review of the policies, practices and customs."
10              THE COURT:  So, what you have not agreed on is the
11    introduction in the disciplinary process of opportunities to
12    undermine accountability?
13              MR. MORAN:  Well, and also the scope of --
14              MR. ODIM:  No.  I agreed to strike that.
15              THE COURT:  Okay.
16              MR. ODIM:  Yeah, I agreed to strike (b).
17              But what we're not agreeing on is this narrowing of
18    the scope of the shootings.  You know, what's improper and
19    unlawful?  When is that decided?  So, in all of these --
20              THE COURT:  I see.
21              MR. ODIM:  -- topics --
22              THE COURT:  I got it.
23              MR. ODIM:  -- we're not -- we're looking for
24    shootings or use of lethal force without restriction to --
25              THE COURT:  Okay.  I understand the dispute now.
```

1          I am going to take that out.  Improper and unlawful

2     police shootings.  It should cover -- because, again, some of

3     that is just argumentative.  What you think is improper --

4          MR. MORAN:  Right.  You know, when we were engaged --

5     so, the way it was originally listed -- or written -- was

6     "officers engaged in misconduct in the use of force."  So, I

7     mean, we were going off sort of --

8          THE COURT:  I think there is an implicit if they are

9     disciplined, there is misconduct.

10         MR. MORAN:  Exactly.

11         THE COURT:  So, No. 9, here is how we are going to do

12    it.  No. 9.  With respect to No. 9, the City should produce a

13    deponent to testify as to the policies, practices and/or

14    customs for disciplining officers involved in police

15    shootings, including the length of time it takes for the

16    disciplinary process to complete, and the City's review and

17    modification of its policies, practices and customs with

18    respect to disciplining officers involved in police shootings.

19         MR. MORAN:  That's good with us.

20         THE COURT:  I think that --

21         MR. ODIM:  Yes, yes.

22         THE COURT:  -- captures what you want.

23         MR. ODIM:  So that we don't have to go backwards, can

24    we make --

25         THE COURT:  I never like to go backwards.

```
 1              MR. ODIM:  Except when you're skating.
 2              Can we all understand that none of the police
 3    shootings that we are talking about for the purpose of this
 4    30(b)(6) is limited to improper or unlawful?
 5              THE COURT:  I do not think any of the language --
 6              MR. ODIM:  Okay.
 7              THE COURT:  -- you have agreed to has included that.
 8              MR. MORAN:  The only reason we put it there is
 9    because how it was originally written.  But, I mean, I -- we
10    don't have any problem --
11              MR. ODIM:  Okay.
12              MR. MORAN:  -- with what has been said.
13              We object to 10 and 11, Judge.  We're not going to
14    reach an agreement.  But we did on No. 10 come to a narrowing.
15    We have competing proposals that are narrowed.
16              So, the plaintiff wants -- has agreed to strike all
17    the subparagraphs except (h) and include the modification
18    language in (h).  I think in that respect the City would not
19    oppose it.
20              THE COURT:  I am sorry.  Would you say that one more
21    time, please?
22              Agreed to strike everything other than (h)?
23              MR. MORAN:  (a) through (g) would be stricken.
24              THE COURT:  Okay.
25              MR. MORAN:  (h) would include the modification
```

1     language.  And in that respect, the City probably will not

2     oppose that.

3            The language up top under No. 10, the City -- or the

4     plaintiff wants it to include lethal force.  So, policies,

5     practices and customs about the supervision and direction of

6     officers in using lethal force.  And we would say that that

7     should be limited to the supervision of officers involved in

8     police shootings and the use of firearms.

9            THE COURT:  And I agree.  I thought we already

10     addressed that.  Lethal force -- now, my guess is the majority

11     of lethal force cases will be shootings.  I do not know if

12     there is a knife case or assault, beating somebody up that

13     would lead to that.

14            But my guess is the majority of what you are seeking

15     would be shootings.  But it should be -- that is what is at

16     issue here.

17            MR. ODIM:  Okay.

18            THE COURT:  So, with that modification, it sounds

19     like you are in agreement.

20            MR. ODIM:  So, 11 is disposed of, I presume, the same

21     way because we use the phrase "lethal force" and --

22            THE COURT:  Should be limited to shootings.

23            MR. ODIM:  Yeah, should be limited to shootings.

24            We have agreed to strike (a) through (d).

25            THE COURT:  Okay.

```
 1              MR. ODIM:  And, then, we'll use the (e) language from
 2    the first subject.
 3              MR. MORAN:  We do have a problem with 11, Judge, and
 4    the way it's written, which is that -- data collection
 5    generally.
 6              THE COURT:  Well, it would be data collection
 7    pertaining to --
 8              MR. MORAN:  Right, but there's no --
 9              THE COURT:  -- the use of firearms.
10              MR. MORAN:  And, so, that basically -- I mean,
11    there's no allegation that the collection of data itself was
12    insufficient and led to, you know, this culture of, you know,
13    however it's alleged in the complaint.  So, the problem is --
14    you know, we can get a techie up there to talk about the
15    systems.  We can get things of that nature.
16              THE COURT:  But is that what you are looking for?
17    Systems?  Are you looking --
18              MR. ODIM:  No.  I've stricken -- I have stricken -- I
19    don't want to talk about software and algorithms and all that
20    sort of stuff.  I want to talk about how the City informs
21    itself about how its officers operate in the field with --
22    when they use -- shoot deadly force.
23              THE COURT:  It sounds like this overlaps with what
24    you are looking for.  Investigations as opposed to data?
25              MR. ODIM:  Right, it --
```

1          THE COURT:  What data --

2          MR. ODIM:  For instance, Judge, does the City collect

3    data about -- and we know they do -- discharge of firearms?

4    What does the City do with that data?  Does it make any policy

5    regarding the use of discharge of firearms that it trains its

6    officers on based upon the data that they collect?  How --

7          THE COURT:  What kind of data are you looking for

8    there?  The other police officers who have engaged in

9    shootings?  Is that what you --

10          MR. ODIM:  No.  The data that informs their decisions

11    about making policy for officers to follow regarding when,

12    how, in what circumstances they shoot or they use deadly

13    force.

14          MR. MORAN:  This is -- I think --

15          THE COURT:  It sounds like it is the same as --

16          MR. MORAN:  Kind of dovetails --

17          THE COURT:  -- investigation.

18          MR. MORAN:  Right.  Well, investigation --

19          MR. ODIM:  Well, yeah, that's -- this may be a

20    labeling thing.  But I don't want to be limited.  I don't want

21    to be -- I don't want to draw an objection that this is just

22    about investigations you're asking a question about.

23          MR. MORAN:  Well, so, Judge, one of the things -- I

24    mean, the first one we talked about, this is No. 1, we -- has

25    been limited to policies, practices and customs about the use

1    of -- or police shootings -- you know, discharge of firearms.

2    I think the questions he's talking about would sort of

3    dovetail into that, in addition to the investigation one that

4    you had just mentioned.

5         So, I don't know that we need to create another

6    category that is going to be somewhat ambiguous; in that, it's

7    kind of premised on this collection of data.  He can ask those

8    questions in the deposition of the person for No. 1 and the

9    other investigation one.

10        But the way it's written right now, there's a number

11   of different ways to look at it.  We could be producing

12   someone who is involved in the actual collection of data,

13   setting up the systems to collect the data.  And, ultimately,

14   what they're looking for, it sounds like, is someone way

15   higher up who looks at things and decides what policy is and

16   should and shouldn't be and whether changes should be made.

17   That's No. 1.

18        MR. ODIM:  Does the City inform itself based on any

19   information when it decides the policies of use of force in

20   shootings?  The City has said it's changing that policy.  On

21   what basis?

22        THE COURT:  I think that will be covered by your -- I

23   think what the hang-up here is the data suggests electronic

24   searches of information.

25        MR. ODIM:  No, that's not what I'm looking for.

```
 1                THE COURT:  Okay.

 2                MR. ODIM:  Absolutely not.

 3                THE COURT:  I did not think --

 4                MR. ODIM:  Yeah, that's not what I'm looking for.

 5                MR. MORAN:  So, I mean, I think it does then -- it is

 6    No. 1.  It's duplicative of No. 1.

 7                THE COURT:  I think any question you want to ask

 8    along these lines would be covered with No. 1.

 9                What type of -- "information" might be a better word

10    to use.  What type of information --

11                MR. ODIM:  Okay.  Then --

12                THE COURT:  -- does the City rely on in forming its

13    policies with respect to the use of firearms?  I think --

14                MR. ODIM:  How does it collect the information?

15                THE COURT:  Right.

16                MR. ODIM:  Does it?

17                Okay.  Then I'm good.

18                THE COURT:  Okay.

19                MR. ODIM:  And I suppose, then, we should

20    short-circuit 12 and 13.  I think they fall in the same

21    bucket.  I'm looking for, you know, how they deal with -- how

22    they use the policies when it impacts minorities and ethnic

23    groups.

24                THE COURT:  So, what type of information --

25                MS. ROSEN:  Well, Judge, the only thing I'm concerned
```

```
1    about is certainly it would be fair game in the way we're
2    discussing it to ask the deponent what information the City
3    gathers to --
4            THE COURT:  Are you on 12?
5            MS. ROSEN:  Yeah, I am.  12 and sort of 13 because
6    they're much more specific in terms of the numbers.  And we've
7    not been asked -- and they read like a document request,
8    right?  So -- and we haven't been asked to run that data.
9            So, if they plan to ask questions like that, in a
10   specific way, like "what are those numbers," as opposed to "do
11   you use those types of numbers," that's sort of different,
12   right, conceptually.
13           THE COURT:  I think he is looking for do you use
14   those type of numbers.
15           MR. ODIM:  Yeah.
16           THE COURT:  What information is it that impacts your
17   policies, practices and customs regarding shootings on racial
18   and ethnic groups.
19           MR. ODIM:  Yeah.  I'm not asking them to run it.  If
20   they've never run it, then that's a fact and it's useful in
21   some way, you know.
22           MR. MORAN:  Again, it's a question that falls under
23   No. 1.  I mean, one of the problems obviously is that we --
24   that no document discovery has taken place in that regard so
25   far in this case.
```

1          So, I mean, asking those questions at a deposition is

2   different from having the City produce someone specifically on

3   that particular topic, because it does create this sort of

4   which type of person do we produce, if it's just going to

5   be -- and, as he said, he narrowed it to the use of the

6   information.  So, I think it's just --

7          MR. ODIM:  No, I haven't narrowed it to the use of

8   information.  I've narrowed it to (e) -- the sub (e).  Do you

9   use it?  Do you modify it?  What categories do you use?

10          THE COURT:  I think that is directly relevant to the

11   allegations in the complaint.

12          MR. MORAN:  I'm not saying that that isn't relevant.

13   It's just the way it's written right now, we've asked them in

14   a point-blank --

15          MR. ODIM:  We changed that.  We've already conceded

16   that the -- falls under the heading of investigation; that is,

17   this data statistics issue.  So, I wanted to short-circuit our

18   having to go through.  But if you want to do that --

19          MR. MORAN:  Well, I mean, it's another way of saying

20   the impact of police shootings in minority communities and

21   what information the City uses, reviews, et cetera, in

22   connection with that.

23          THE COURT:  With its policies, practices and customs?

24          MR. MORAN:  Yeah.

25          THE COURT:  I think that is what you're looking for.

```
 1            MR. ODIM:  Yeah.

 2            MR. MORAN:  So, I mean, with that modification, I

 3  mean --

 4            MR. ODIM:  No.  He keeps narrowing it.  I don't want

 5  a record that says I agreed to just the use issue, you know.

 6  The question is:  Did the City have a meeting?  Did the City

 7  sit down and say, we need to collect information in these

 8  categories because we have noticed that young African

 9  Americans are being shot in a disproportionate way; and, did

10  they have those -- that information collected?

11            Not just use.  It's the scope of it.

12            THE COURT:  So, the City's policies, practices and

13  customs regarding shootings impacting racial and ethnic

14  groups, including how -- what information they relied on in

15  forming those policies?

16            MR. ODIM:  I think that gets there.

17            THE COURT:  Okay.

18            Is that okay with the City?

19            MR. MORAN:  Including --

20            MR. ODIM:  And how they use it.  So --

21            MR. MORAN:  So --

22            THE COURT:  Yes.  How --

23            MR. ODIM:  And the relevant -- the relevant --

24            MR. MORAN:  So, how do you use it.

25            MR. ODIM:  No, no.
```

1    THE COURT:  How they use the information -- well, it

2 is what information they use in forming their policies --

3    MR. ODIM:  Yeah.

4    THE COURT:  -- and customs and practices, which I

5 think would -- how they used it in forming them.

6    MR. MORAN:  And that would be --

7    THE COURT:  Not what it is, have you run it, but do

8 you use it; and, if so, how does that impact the policy?

9    MR. MORAN:  And that would be replacing No. 12 and

10 13?

11    THE COURT:  That definitely covers 12.  Let's see if

12 it covers 13, as well.

13    MR. ODIM:  13 is -- conceptually is -- the general

14 category of statistics, not related directly to -- no.  Put it

15 differently, the -- 12 is the subset of 13.

16    THE COURT:  So, are you asking for the statistics?

17    MR. ODIM:  No.  I was asking for --

18    THE COURT:  Because that is what it looks like.

19    MR. ODIM:  Yeah, well -- yes.  And I have -- it's

20 taken a while.

21    THE COURT:  I know.

22    MR. ODIM:  But I clawed it, I scratched it all out as

23 soon as we walked in there.

24    MR. MORAN:  Right.

25    MR. ODIM:  I wasn't asking -- I was literally asking

1    for the same thing, you know.  What is the data that you asked

2    for that informs your policy-making decisions?

3            And I wasn't asking them to give me the data, to run

4    new data that they have never done before.  If they've never

5    done it, then that's what I want to hear.

6            THE COURT:  So, yes, I think 12 covers 13.

7            MR. MORAN:  Okay.  So, we have.  That's what I

8    thought.

9            THE COURT:  Okay.

10           MR. MORAN:  So, the only other issue remaining,

11   Judge, is they owe us some discovery, as well.  And that is --

12   we told them that we'd end up filing -- I'm just letting you

13   know we may end up filing a motion to compel.  I don't know.

14   They still have to tell us what they're going to do.

15           MR. ODIM:  We --

16           THE COURT:  While you are here, what -- even though

17   there is no motion, what information do they owe you still?

18   What discovery are you seeking?  And is it fact?

19           MR. ODIM:  It's fact.

20           MR. MORAN:  Well, fact related to Monell.  So, we had

21   sent some contention interrogatories and the answers

22   identified some specific information, but they also left the

23   door open for all kinds of other things to come in.  They use,

24   like, catch-all categories and things like that.  And this is

25   the prior attorneys who had the case.

44

1          So --

2               THE COURT:  Have you met and conferred on it?

3               MR. MORAN:  Yes, we --

4               MR. ODIM:  We --

5               MR. MORAN:  We have not conferred on that topic yet

6     because we've been kind of consumed with this one.

7               THE COURT:  Sure.

8               MR. MORAN:  But I did put them on notice that it's on

9     the horizon and if we don't get some kind of response, we have

10    to take action.

11              THE COURT:  So, why don't you -- especially with new

12    attorneys, why don't you meet and confer on that, certainly in

13    light of guidance today, and see if you can reach agreement.

14    If not, you can --

15              MR. ODIM:  There's an outstanding discovery issue on

16    the requests to admit --

17              THE COURT:  Include that in --

18              MR. ODIM:  So, we'll include that in as part of that

19    discussion.

20              Thank you, Judge.

21              THE COURT:  So, wait.

22              MS. ROSEN:  Judge, I think we need --

23              THE COURT:  Before you run away --

24              MS. ROSEN:  -- to adjust the schedule.

25              THE COURT:  Yes, before you run away.

```
1              So, is non-expert Monell discovery completed?
2              MS. ROSEN:  Not with the 30(b)- -- unless you
3    count -- I mean, I count 30(b)(6) witnesses as non-expert.
4              THE COURT:  I would, too.  I guess I should have
5    clarified that.
6              Other than 30(b)(6), is there anything else that you
7    need to do on non-expert Monell discovery?
8              MR. ODIM:  Not for the plaintiff.
9              MR. MARX:  No, Judge.
10             And, by the way, I'm Jason Marx for the defendant
11   officers except for Sampim.  I'm sorry I was late this
12   morning.  I had a conflicting court time.
13             THE COURT:  I will not be offended that you went
14   somewhere else first.
15        (Laughter.)
16             THE COURT:  How long do you need to get your 30(b)(6)
17   witnesses ready?
18             MR. MORAN:  So, we estimated approximately seven
19   witnesses.  I would think that that's going to take somewhere
20   in the range of 30 to 60 days to get done.
21             THE COURT:  I was thinking 45.
22             MR. ODIM:  Sounds good.
23             THE COURT:  So, 45 days --
24             Where does that take us, Katie?
25             -- to complete non-expert Monell depositions.
```

```
 1              MR. MORAN:  Judge, one issue --

 2              THE COURT:  One second.  Let me just give you a date.

 3              THE CLERK:  May 15th.

 4              MR. MORAN:  Judge --

 5              MS. ROSEN:  Unfortunately, that coincides with a

 6    trial we have set for May 17th.  So, if we could just maybe go

 7    a little bit --

 8              THE COURT:  May 30th?

 9              MS. ROSEN:  Yeah.  So, let's do May 30th.

10              THE COURT:  Okay.

11              And, then, plaintiff's Monell expert disclosures, if

12    I give you June 16th, does that give you time?  That's about

13    the same schedule that you had time-wise before.

14              MR. ODIM:  I'm going to plead a personal issue.  We

15    have three graduations in the family.

16              THE COURT:  I will not mess with graduations,

17    weddings, births of children.

18              MR. ODIM:  Two on the east coast, one in California.

19    So, if we could go --

20              THE COURT:  How much time beyond that?  Give me a

21    date.

22              MR. ODIM:  To the end of -- early July.

23              THE COURT:  July 7th?

24              MR. ODIM:  July 7th is good.

25              THE COURT:  Okay.
```

1            So, plaintiff's Monell expert disclosures are due

2     July 7th, with the depositions to be completed by August 25th.

3            Defendant's Monell expert disclosures are due

4     September 29th.  And depositions should be completed by

5     November 10th.

6            Two things.  I have modified the schedule multiple

7     times now.  It is time to get going.  This is a 2015 case.

8     Time to get going.

9            Second thing, settlement.  Before you come back here,

10    once you have had some of these 30(b)(6) depositions, I would

11    like you to actually talk again about settlement before you

12    get too deep into expert discovery, which is always very

13    expensive.  And you can let me know when you come back here if

14    there is any interest in going to see Magistrate Judge

15    Finnegan for a settlement conference.  She is excellent if you

16    think you are anywhere in the same ballpark.  So, I want you

17    to have those discussions before we start and go too deep down

18    the road on expert.

19           And come back here -- you have a May 30th deadline.

20           How long is your trial?

21           MR. MORAN:  Four weeks.

22           THE COURT:  The one that starts on the 17th?

23           MS. ROSEN:  Yeah.

24           THE COURT:  Will somebody be able to come that

25    following week, the 23rd?

1              MS. ROSEN:  Yeah.

2              THE COURT:  Okay.

3              May 23rd at 8:30 we will have another status.

4              Is there anything else this morning?

5              MR. ODIM:  Nothing from the plaintiff, Judge.  Thank

6    you.

7              THE COURT:  Anything else?

8              MR. MORAN:  Nothing from us.

9              THE COURT:  Thank you.

10             MS. ROSEN:  Thank you, Judge.  Thank you for your

11   time.

12                         *     *     *     *     *

13

14   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.
15

16   /s/ Joseph Rickhoff                    April 12, 2017
17   Official Court Reporter

18

19

20

21

22

23

24

25