**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ESTATE OF ROSHAD MCINTOSH, Deceased, by Cynthia Lane, Administrator,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF CHICAGO, et al.,<br><br>Defendants. | Case No. 15-cv-01920<br><br>Judge Mary M. Rowland |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Cynthia Lane, the Administrator of the Estate of Roshad McIntosh ("McIntosh"), brought this civil rights action under 42 U.S.C. § 1983 against four Chicago police officers and the City of Chicago. McIntosh was shot and killed on August 24, 2014. Plaintiff alleges that Officer Slechter used excessive force in violation of the Fourth Amendment and brings state-law claims against him including for wrongful death and funeral expenses. Against all four officers, Plaintiff alleges they conspired to cover up the shooting. Against the City, she brings several claims including one under *Monell v. Department of Social Services of the City of New York,* 436 U.S. 658 (1978). For the reasons stated below, Defendant City's Motion to bar the opinions of Plaintiff's Expert [308] is granted. Defendant Officer Sampim's motion for summary judgment [302] is granted in part and denied in part. Defendant Officers Bowery, Zodo, and Slechter's motion for summary judgment [303] is granted

1

in part and denied in part. Defendant City's motion for summary judgment [309] is granted in part and denied in part.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are material. *Id*. After a "properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Id*. at 250 (quoting Fed. R. Civ. P. 56(e)).

The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and [ ] draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Logan v. City of Chicago*, 4 F.4th 529, 536 (7th Cir. 2021) (quotation omitted). The Court "must refrain from making credibility determinations or weighing evidence." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 467 (7th Cir. 2020) (citing *Anderson*, 477 U.S. at 255). In ruling on summary judgment, the Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the

2

non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id.*

## BACKGROUND[1]

On Sunday, August 24, 2014, Defendant Officers Slechter, Sampim, Bowery, and Sergeant Zodo were on duty police officers for the City of Chicago. DSOF ¶ 5. Defendants Sampim and Zodo and Officers Patrick Staunton, Joshua Zapata and Patrick Kelly worked as part of the 11th District Gang Enforcement Team. *Id.* ¶ 6. Defendants Slechter and Bowery and Officer Andrew Neberieza belonged to the 11th District Tactical team. *Id.* ¶ 7. On August 24, 2014, 2842 Polk was a multi-unit residence, with a fenced yard in the back and a two-story porch attached to the back. *Id.* ¶¶ 17, 20. An empty lot sat immediately east of the property. *Id.* ¶ 21. A police surveillance camera located at 2900 West Polk, called an OVS camera, captured a portion of the events. *Id.* ¶ 22. The camera's view displayed the front of 2842 West Polk and the empty lot directly to the east of that property. *Id.* ¶ 23. Prior to August 24, 2014, the Officers were familiar with this address and the surrounding area; the location was known gang territory controlled by the Traveling Vice Lords, Cali Boys. *Id.* ¶¶ 25, 26. There is a history of shootings and gun violence in that location; several Officers were aware that only about one week earlier, there had been a shooting within a half block of the location, and six people were shot and one person killed. *Id.* ¶¶ 27, 28.

---

[1] The facts herein are taken from the parties' Local Rule 56.1 statements ("DSOF" (Dkt. 304) and "PSOF" (Dkt. 331) and are undisputed unless otherwise noted.

On August 24, 2014, Zapata received a phone call from another Gang Enforcement officer, David Salgado (who was on furlough), who told Zapata that he had an informant with information. *Id.* ¶ 10. Salgado told Zapata that his informant reported that there were two individuals, both black males, one in a white t-shirt and one in a dark colored t-shirt, armed with guns on the 2800 block of Polk. *Id.* ¶¶ 11, 12, 14.[2]

Officers Slechter, Neberieza, and Bowery went with Kelly and Zapata to assist the Gang Enforcement Unit; they drove to Harrison and California where they met up with Sampim, Staunton, and Zodo. *Id.* ¶¶ 33, 48. From the intersection of Harrison and California, the officers traveled to 2842 West Polk together in three separate unmarked "M" plate Crown Victorias. *Id.* ¶¶ 44, 48. Zapata, Kelly, Neberieza, Bowery, and Slechter rode together in the first vehicle; Sampim and Staunton were in the second vehicle; and Zodo was alone in the third. *Id.* ¶¶ 45–47. The Officers arrived at 19:09 (when it was still daylight) at 2842 West Polk and pulled up next to the empty lot, east of 2842 Polk. *Id.* ¶¶ 48, 49. When the Officers arrived on scene, a group of approximately ten to twelve males stood on the sidewalk by the address. *Id.* ¶ 50. Another group of people stood a few houses down and across the street. *Id.* ¶ 51. The Officers all wore items that identified them as police. *Id.* ¶ 58.

The Officers exited their vehicles, announced their office, and began giving verbal directions to the men at the front of the empty lot, instructing everyone to show their hands or to put their hands up. *Id.* ¶ 61. Officer Slechter believed that the two men described as having weapons were on Polk Street at the time they arrived on scene.

---

[2] Plaintiff disputes the "truth and accuracy of anything attributed to Salgado" based on his 2019 conviction *e.g.*, DSOF ¶¶ 10–16; Dkt. 330. The Court addresses this argument, below.

*Id*. ¶ 62. Upon exiting the vehicle, Slechter approached a male wearing a white hat and white shirt and performed a protective pat down. *Id*. ¶ 63. McIntosh was wearing a hat, dark shirt, and blue jeans. *Id*. ¶ 67. Zapata told McIntosh to "come over here" but McIntosh did not comply. *Id*. ¶ 69. Instead McIntosh started to run; he was the only individual who ran from the police when they arrived. *Id*. ¶¶ 72, 73. McIntosh initially ran west before turning north and running into the gangway. *Id*. ¶ 76. Officers Neberieza and Zapata chased after McIntosh into the gangway; Zapata was yelling at McIntosh to stop. *Id*. ¶¶ 77, 78. Slechter and Bowery started to run north, through the empty lot. *Id*. ¶ 79. Slechter assumed that McIntosh was armed. *Id*. ¶ 81. Sampim remained on the sidewalk with Staunton because several other individuals were still there, and four Officers were already chasing McIntosh. *Id*. ¶ 82. Slechter ran through the vacant lot to the alley behind the yard and entered the yard through an opening on the western side of the back fence. *Id*. ¶ 83. At the time Slechter entered the yard, Bowery was in the alley, a little bit west of the vacant lot. *Id*. ¶ 84. After McIntosh emerged from the gangway, he started to run up the stairs onto the back porch. *Id*. ¶ 86. After Slechter drew his weapon, he told McIntosh to "stop." *Id*. ¶ 90. According to Defendants, Slechter and Bowery then yelled at McIntosh drop the gun and to show his hands. *Id*. ¶ 91. Plaintiff disputes that the officers yelled at McIntosh to drop the gun and deny that McIntosh had a gun. (*see* Dkt. 330, ¶¶ 85, 89, 91).

Defendants contend that McIntosh looked in Slechter and Bowery's direction, made a right turn into the yard, and ran up the stairs to the first level of the porch. DSOF ¶ 92. As McIntosh climbed the stairs; Slechter walked southeast through the

yard, pointing his gun at McIntosh. *Id*. ¶¶ 93, 94. Slechter fired his weapon at McIntosh. *Id*. ¶ 96. At the time Slechter fired his weapon, he was standing in the yard without any cover. *Id*. ¶ 98. Slechter fired three shots in quick succession. *Id*. ¶ 100. McIntosh was facing Slechter when Slechter shot him. PSOF at ¶ 5. Officer Bowery entered the yard after Slechter fired the shots and McIntosh fell. DSOF ¶ 103. The parties agree that Officer Sampim would not have been able to see, at the time shots were fired, whether McIntosh was armed, the position of his arms, or if McIntosh was attempting to surrender. *Id*. ¶¶ 107, 108.

Sergeant Zodo was in his vehicle at the time he heard shots and entered the yard after the shots were fired. *Id*. ¶¶ 109, 110. Zodo went up onto the porch after the shots were fired and observed McIntosh had been shot. *Id*. ¶¶ 111-112. A silver 9mm semiautomatic handgun was recovered from the scene. *Id*. ¶¶ 114, 115. Slechter fired his gun at 19:10:27, less than 28 seconds after McIntosh started to run. *Id*. ¶ 116.[3] Slechter was the only officer to discharge his firearm. *Id*. ¶ 118. McIntosh died from two gunshot wounds. *Id*. ¶¶ 122, 123.

The following claims remain: a claim under Section 1983 for excessive force against Officer Slechter; state-law claims for wrongful death, survival, funeral expenses, and battery against Slechter;[4] a conspiracy claim against Officers Slechter,

---

[3] Based on the video, Plaintiff estimates the time between McIntosh starting to run and shots fired as 27 seconds; Defendants estimates this time as 24 seconds. DSOF ¶ 116; Dkt. 330 ¶ 116. In any event, it is undisputed that this time was less than 28 seconds.

[4] Plaintiff dismisses with prejudice Count I, III, IV and V against Bowery, Zodo and Sampim. Plaintiff also dismisses with prejudice Count VI (IIED) against all the individual defendants. (*see* Dkt. 329, n. 2).

Sampim, Zodo and Bowery; and a *Monell* claim and *respondeat superior* and indemnification claims against the City.

## ANALYSIS

### I. Excessive Force (Count I – Officer Slechter)

Officer Slechter moves for summary judgment, arguing that his use of deadly force did not violate the Fourth Amendment because it was objectively reasonable for him to believe that McIntosh posed an imminent threat of death or great bodily harm to Slechter and others. Plaintiff responds that summary judgment is rarely granted in excessive force cases and that there is a question of material fact here about whether Slechter had probable cause to believe that McIntosh posed an imminent threat.

"A police officer's use of deadly force on a suspect is a seizure within the meaning of the Fourth Amendment, so the force must be reasonable to be constitutional." *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018) (citation omitted). "[A] suspect has a constitutional right not to be shot by an officer unless he reasonably believes that the suspect poses a threat to the officer or someone else." *Id*. at 949 (cleaned up). In excessive force cases courts apply an objective reasonableness standard. *Taylor v. City of Milford*, 10 F.4th 800, 806 (7th Cir. 2021). This standard "is incapable of precise definition or mechanical application." *Abbott v. Sangamon County*, 705 F.3d 706, 724 (7th Cir. 2013) (cleaned up). Courts assess the totality of the circumstances, carefully balancing "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Weinmann v. McClone*, 787 F.3d 444, 448 (7th Cir. 2015) (quoting *Graham v. Connor*,

490 U.S. 386, 395–96 (1989)). To balance these factors, courts consider "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

As Plaintiff argues, "summary judgment is often inappropriate in excessive-force cases because the evidence surrounding the officer's use of force is often susceptible of different interpretations" and this is particularly relevant where, like here, "the one against whom force was used has died, because the witness most likely to contradict the officer's testimony—the victim—cannot testify." *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 862 (7th Cir. 2010); *see also Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005) (explaining that summary judgment in excessive force cases should be granted sparingly); *Taylor*, 10 F.4th at 811 (holding that a jury must resolve material disputes of fact about whether individual was a threat to himself or others and whether officer's force was objectively reasonable under the circumstances).

To argue that his use of deadly force was objectively reasonable, Officer Slechter points to evidence that: (1) he and other officers were in the area that day to investigate a tip they received about two armed men at or near 2842 West Polk Street; (2) Slechter knew that the area was known for gang and drug activity, shootings, and gun violence; (3) after Slechter and other officers identified themselves as police officers to the group and after Slechter began performing a protective pat down of

another individual, he saw McIntosh run from Officer Zapata; (4) McIntosh matched the description of one of the men armed with a gun; (5) when McIntosh started running, Slechter assumed he was involved with the local street gang and was armed with a weapon; (6) after a brief chase to the back of the house, Slechter saw McIntosh emerge from the gangway with a gun in his hand; (7) Slechter drew his weapon and repeatedly yelled at McIntosh to drop his gun; and (8) instead of discarding his gun, McIntosh pointed the gun at Slechter while Slechter stood in the backyard, without any cover, and that is when Slechter fired three shots at McIntosh.[5] Although the police surveillance camera captured a portion of the events, Slechter does not argue that the video footage shows McIntosh with a gun, and the Court cannot discern from the video whether McIntosh had a gun.

Plaintiff concedes some facts but vigorously disputes others. It is undisputed that the location was known gang territory with a history of shootings and gun violence. (DSOF ¶¶ 26, 27; Dkt. 330). Plaintiff does not dispute that McIntosh was the only individual who ran from the police, Officer Zapata yelled at McIntosh to stop, and Slechter ran through the empty lot. (DSOF ¶¶ 73, 78, 79; Dkt. 330). Nor does Plaintiff dispute that Slechter assumed that McIntosh was armed; that at the time Slechter fired his weapon, he was standing in the backyard, without any cover; and that he fired three shots at McIntosh. (DSOF ¶¶ 81, 98, 100; Dkt. 330). However Plaintiff

---

[5] Slechter cites the fact that as McIntosh turned to run, McIntosh's "right hand was grabbing the side of his waistband." (Dkt. 307 at 5). However the evidentiary support for this statement comes only from Officers Sampim, Staunton, Bowery, Zapata, Neberieza and Kelly, not Slechter. (DSOF ¶ 74).

disputes a key fact: whether McIntosh had a gun. Plaintiff argues that McIntosh did not possess a gun at all during his encounter with the Officers, much less point it at Slechter.

To support her version of events, Plaintiff relies on the testimonies of three eyewitnesses: Loren Marks, Jerry Hunter, and Lonzo Williams. Marks provided a sworn declaration stating that he was in the empty lot to the east of 2842 West Polk on the evening of August 24, 2014. (Marks Decl. (Dkt. 331-4)). He stated that he saw McIntosh on the back porch at 2842 West Polk with his hands up and palms out and nothing in his hands. (*Id*.) Marks saw a police officer in the backyard point a gun at McIntosh and fire several times, striking McIntosh. (*Id*.) Marks stated that he never saw McIntosh with a gun and did not see a gun in McIntosh's hand when he was shot. (*Id*.) Slechter does not question Marks' testimony that he saw Slechter shoot McIntosh. Rather, he questions whether "Marks can, or did, provide credible testimony regarding whether McIntosh had a handgun *after* being shot" because Marks immediately left the scene after Slechter shot McIntosh. (Dkt. 341 ¶ 1 (emphasis added)). This does not contradict Marks' account that he never saw McIntosh with a gun that day, including at the time he was shot. And Slechter's reliance on the officers' version of events in response to Marks' testimony (Dkt. 341 ¶ 1) only bolsters Plaintiff's argument that these competing accounts create a question of fact about Slechter's use of deadly force. Crediting the Officers' account and ignoring Plaintiff's witnesses runs head long into the well-settled rule that on summary judgment the Court "do[es] not judge the credibility of the witnesses,

evaluate the weight of the evidence, or determine the truth of the matter." *Gonzalez v. City of Elgin*, 578 F.3d 526, 529 (7th Cir. 2009); *see also Weinmann v. McClone*, 787 F.3d 444, 449 (7th Cir. 2015) ("Our task is to determine, under [plaintiff's] version of the facts, if [the officer] was objectively reasonable in his belief that his life was in danger.").[6]

Slechter contends that Williams and Hunter gave such unreliable and inconsistent statements that the Court should ignore their testimonies. Like Marks, Williams provided a sworn declaration stating that he saw a police officer shoot McIntosh. (Williams Decl. (Dkt. 331-3)). He testified that he saw McIntosh put his hands up, with nothing in his hands, and that he never saw McIntosh with a gun. (*Id.*) Slechter argues that Williams "testified that he was not looking at McIntosh at that moment the shots were fired." (Dkt. 342 at 6). In Williams's deposition he testified that although it happened very fast, he saw McIntosh on the porch with his hands up, and when the officer began shooting, Williams looked at the officer. (Williams Dep. (Dkt. 331-2), pp. 55–58). This testimony is not directly contradictory to his sworn declaration. However to the extent that Slechter believes Williams's deposition calls into question his credibility or his version of the facts as articulated in his declaration, he remains free to explore those issues during cross-examination at trial. The Court will not assess credibility nor weigh evidence on summary judgment.

---

[6] In addition, a jury will need to weigh the video footage alongside other evidence in this case. *See Rios v. City of Chicago*, 523 F. Supp. 3d 1020, 1026 (N.D. Ill. 2021) ("Given the limited clarity of the video, . . . [a]t this stage of proceedings, the Court need only ask if any reasonable juror could see it the way plaintiff does, and, on the Court's viewing, the answer is yes.").

As for Hunter, Slechter argues he has given multiple, inconsistent statements about whether McIntosh possessed a gun at the time of the encounter. Slechter points to, for example, the statement Hunter gave to an Assistant State's Attorney on August 25, 2014 that McIntosh carried a silver hand gun at his side that day. (Hunter Dep. (Dkt. 305-7), Exh. 1). These inconsistent accounts might undermine Hunter's credibility as an eyewitness. Again, however, the Court will not assess these witnesses' credibility. That is the jury's province. *See Ramos v. Drews*, No. 14-CV-2556, 2018 WL 5046087, at *10 (N.D. Ill. Oct. 16, 2018) (stating that "elementary summary judgment principles prevent the court from making credibility determinations, such as weighing the effect of a witness' prior, allegedly inconsistent statements on the witness' testimony.") (citing *Williams v. City of Chicago*, 733 F.3d 749, 752 (7th Cir. 2013)); *Allen v. Chi. Transit Auth.*, 317 F.3d 696, 699–700 (7th Cir. 2003) (explaining that even when a "witness repeatedly contradicts himself under oath on material matters," his credibility "becomes an issue for the jury; it cannot be resolved in a summary judgment proceeding").

Plaintiff also questions the tip that the officers received from Officer Salgado about two armed men being at the location that day, pointing to Salgado's conviction in October 2019 on multiple counts including obstruction of justice and making a false statement to the FBI (*USA v. Salgado*, 18-CR-00286(2)). Slechter responds that Salgado's "status as the tipster, or as a convicted felon, is irrelevant." (Dkt. 342 at

4).[7] The Court will not make a credibility determination about Salgado on summary judgment and in any event, the Court finds other questions of material fact preclude summary judgment.

Finally, Plaintiff concedes that a silver 9mm semiautomatic handgun was recovered from the scene, but disputes that the gun was on the porch next to McIntosh's body when the Officers went to place McIntosh in handcuffs. Plaintiff points to evidence that McIntosh's fingerprints were not found on the gun and that the Primer Gunshot Residue (PGSR) test found no PGSR particles on McIntosh. Slechter argues that the physical evidence (or lack thereof) connecting McIntosh to the gun recovered does not demonstrate that McIntosh was not holding a weapon.[8] A jury will need to weigh the various pieces of evidence about the gun and draw its own inferences therefrom; this dispute further demonstrates that this a prime case for "a jury to sift through disputed factual contentions." *Abdullahi*, 423 F.3d at 773 (quoting *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002)).

---

[7] Neither party cites case law supporting their position on this issue. The Court notes the assessment of the tip and tipster is often a fact-intensive inquiry. *See Draine v. Bauman*, 708 F. Supp. 2d 693, 700 (N.D. Ill. 2010) (explaining that "[t]he status of the individual reporting to the police is also significant in determining the credibility of the information he provides."); *Pearce v. Thiry*, No. CIV.A.08 C 4483, 2009 WL 3172148, at *5 (N.D. Ill. Oct. 1, 2009) (in case where police officers received a tip from an unidentified informant, the court, viewing the evidence in the light most favorable to plaintiff, found "genuine issues of material fact whether there was reasonable suspicion to stop [plaintiff] for a crime and when the stop became an arrest."); *see also United States v. Lopez*, 907 F.3d 472, 479 (7th Cir. 2018) (explaining that "informant identities exist along a spectrum of knowledge and reliability that affects the reasonableness of police action taken pursuant to the tip.").

[8] Although Defendants provide photos of the scene, and the photos show a silver handgun, they do not show McIntosh at or near a gun. (Dkt. 305-3, Exh. N # 27-28).

Slechter maintains that the "facts of this case [] closely mirror" *Conley-Eaglebear v. Miller*, No. 16-3065, 2017 WL 7116973 (7th Cir. 2017). Not so. True that case also involved a Fourth Amendment excessive force claim based on an officer's alleged use of deadly force. *Id.* at *1. The Seventh Circuit affirmed summary judgment in favor of the officer, finding that "a reasonable officer under the circumstances would be justified in using deadly force against a fleeing armed suspect reaching for a gun." *Id.* However there the *"undisputed facts* show[ed] that Conley–Eaglebear, while running away from [the officer], drew a gun from his waistband and looked back over his shoulder toward [the officer]." *Id.* at *2 (emphasis added). It is far from undisputed in this case that McIntosh had or brandished a gun during his encounter with the police. In addition, even if the undisputed record showed that McIntosh possessed a gun that day, that would not end the inquiry. The Seventh Circuit recently reiterated that the nature of the threat is relevant: "[h]aving a weapon is not the same thing as threatening to use a weapon." *Estate of Biegert v. Molitor*, 968 F.3d 693, 700 (7th Cir. 2020).

The Court is "mindful that [Slechter] acted in a rapidly unfolding situation and that officers are to be given leeway under those circumstances." *Abbott*, 705 F.3d at 731. But viewing the facts and construing all reasonable inferences from the evidence in Plaintiff's favor, *id.* at 729; *Horne v. Elec. Eel Mfg. Co., Inc.*, 987 F.3d 704, 709 (7th Cir. 2021), the evidence in this case raises disputes of material fact about Slechter's use of force requiring resolution by a jury. Summary judgment on Count I is denied.

## II. Wrongful Death and Battery (Counts III and VIII – Officer Slechter)

Officer Slechter argues that his use of deadly force was objectively reasonable and therefore not willful and wanton. As a result, Slechter asserts, he is entitled to immunity from liability for the wrongful death and battery claims under Section 2–202 of the Illinois Local Government and Governmental Employees Tort Immunity Act. Plaintiff argues that she has shown that there is a genuine issue of material fact about whether Slechter acted with willful and wanton disregard in shooting the unarmed McIntosh.[9]

The Tort Immunity Act immunizes public employees from liability for any "act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." 745 Ill. Comp. Stat. 10/2-202.[10] "The question of whether [a] defendant is liable for willful and wanton behavior is ordinarily a question for the jury." *Geimer v. Chi. Park Dist.*, 650 N.E.2d 585, 592 (Ill. App. Ct. 1995). Because the Court concluded that a jury must decide whether Slechter's use of deadly force against McIntosh was legally justified, summary judgment on the wrongful death and battery claims also is unwarranted. *See Watson v. Fulton*, No. 15 C 11559, 2020 WL 1248678, at *12 (N.D. Ill. Mar. 16, 2020) (finding that although the factual question was a close one, "viewing the facts in the light most favorable to [plaintiff] means he is entitled to have a jury determine whether the

---

[9] Plaintiff only pursues the battery claim against Slechter. (Dkt. 329 at 11-12). The battery claim is therefore dismissed with prejudice as to the other officers.

[10] "Willful and wanton conduct" means "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." 745 Ill. Comp. Stat. 10/1-210.

[officers] engaged in actions for which [they] can be held liable under Illinois law") (cleaned up); *cf. Horton*, 883 F.3d at 954 (finding the officer's actions objectively reasonable, and therefore not willful and wanton, and that defendants were entitled to immunity).

The Court denies Slechter's summary judgment motion as to Counts III and VIII.

### III. Survival and Funeral Expenses (Counts IV and V – Officer Slechter)

Officer Slechter argues that Plaintiff's survival and funeral expenses claims cannot survive summary judgment because there is no evidence McIntosh experienced any pain and suffering before his death. Plaintiff agrees that to recover survival damages, she must offer proof of actual conscious pain and suffering before death. Plaintiff argues that she has provided such evidence, making the duration of his conscious pain a material question of fact.

Plaintiff's expert, James A. Filkins, MD, opined that "within a reasonable degree of medical certainty, [] Mr. McIntosh would at least have become unconscious within 5 to 15 seconds of sustaining the gunshot wound that damaged his heart and that he would have died shortly thereafter." (Filkins Report (Dkt. 331-5) at 4). Slechter argues that the "factual basis for this statement of fact says absolutely nothing about McIntosh being conscious for 5 to 15 seconds." (Dkt. 342 at 9–10). At trial Slechter's counsel may cross-examine Dr. Filkins about the evidentiary basis for his opinions, including how he concluded that McIntosh remained conscious for five to fifteen seconds after being wounded. But Slechter did not move to exclude any of Dr. Filkins's opinions under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993).

16

Thus, Plaintiff has provided admissible evidence, in the form of expert testimony, creating a triable question about the duration of McIntosh's conscious pain. Summary judgment on Counts IV and V is denied.

### IV. Conspiracy (Count VII – Slechter, Bowery, Zodo and Sampim)

Defendants assert that the record is devoid of evidence that Defendants had an agreement, express or implied, to deprive Plaintiff of a constitutional right. (Dkt. 307). Plaintiff responds that she has provided evidence that Slechter, Bowery, Zodo and Sampim conspired to cover up Slechter's unconstitutional shooting of the unarmed McIntosh.[11] She says they did this by (1) giving a false justification for their presence at 2842 West Polk that day, (2) falsely reporting that Slechter ordered McIntosh to drop the gun before shooting him, (3) Sampim falsely reporting that he saw McIntosh pointing a gun at Slechter prior to the shooting, and (4) Zodo misrepresenting his location when the shots were fired—claiming to be in the alley—allowing him to reach a conscious McIntosh soon after the shooting (5) in order for Zodo to falsely report that McIntosh had a gun in his right hand, which he dropped following an order from Zodo.[12]

---

[11] On summary judgment, Plaintiff does not pursue her theory that the Officers "conspired . . . to unreasonably . . . shoot and kill Roshad McIntosh." (Am. Comp. Dkt. 12 ¶ 56). Plaintiff's conspiracy claim on this basis is waived.

[12] In arguing that the officers "false[ly] justified" their "presence at 2842 West Polk", it is not clear if Plaintiff's theory is that the Officers "falsely reported" that Officer Salgado provided them information or that Officer Salgado in fact provided them information, but they should have known the information was not reliable because Salgado was not credible. (Dkt. 329 at 4). In addition, Zapata is the officer who received the tip from Salgado and relayed it to the others, yet Zapata is not named as a defendant in the conspiracy claim or in this case at all. The Court should not, at this stage, be guessing Plaintiff's theory. *See Bunn v. Fed. Deposit*

In Illinois, "[c]onspiracy is not a separate tort." *Malek v. Malek*, No. 19 CV 8076, 2020 WL 6075871, at *11 (N.D. Ill. Oct. 15, 2020). However Illinois does "recognize[] civil conspiracy as a distinct cause of action." *Dowd & Dowd, Ltd. v. Gleason*, 693 N.E.2d 358, 371 (Ill. 1998). Under Illinois law, "[t]he elements of a civil conspiracy are: (1) a combination of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act." *Fritz v. Johnston*, 807 N.E.2d 461, 470 (Ill. 2004). "Summary judgment should not be granted if there is evidence from which a reasonable jury could infer the existence of a conspiracy. Because conspiracies are often carried out clandestinely and direct evidence is rarely available, plaintiffs can use circumstantial evidence to establish a conspiracy, but such evidence cannot be speculative." *Beaman v. Freesmeyer*, 776 F.3d 500, 510–11 (7th Cir. 2015) (citations omitted).

Here, Plaintiff has provided sufficient circumstantial evidence at this stage from which a jury could find a conspiracy amongst Slechter, Sampim and Zodo to cover up Slechter's alleged unconstitutional shooting.[13] Before discussing the evidence on

---

*Ins. Corp. for Valley Bank Illinois*, 908 F.3d 290, 297 (7th Cir. 2018) ("It is [plaintiff's] responsibility in opposing summary judgment to identify the evidence that would sufficiently raise a disputed issue for trial."); *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 973 (7th Cir. 2020) ("Summary judgment is the proverbial 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events.") (cleaned up). The conspiracy claim based on the tip from Salgado, in other words, the "false justification" for the officers' presence at 2842 West Polk that day, is therefore waived.

[13] The only evidence Plaintiff cites regarding Bowrey is that Bowrey saw Zodo handcuff McIntosh. This does not implicate Bowrey in the alleged conspiracy. (PSOF ¶ 22).

summary judgment, the Court addresses Defendants' arguments that Plaintiff needs to establish a "viable underlying substantive claim" (Dkt. 302 at 31), and that Plaintiff's conspiracy claim cannot be based on a "claim of a cover up after the shooting took place." (Dkt. 342 at 11). First, the claims of excessive force, wrongful death and battery against Slechter all survive summary judgment. Therefore there are surviving claims underlying Plaintiff's conspiracy claim. Next, the Court does not agree that the alleged post-shooting cover-up cannot be a basis for Plaintiff's conspiracy claim.

Courts have allowed Illinois state law conspiracy claims to proceed based on a claim that officers conspired to cover up a fellow officers' use of excessive force. *See e.g. Pena v. Ortiz*, 521 F. Supp. 3d 747, 751 (N.D. Ill. 2021) (conspiracy claim based on allegation that officers conspired to prepare false police reports and otherwise cover up fellow officer's use of excessive force survived dismissal motion); *Murphy v. Smith*, No. 12-CV-0841-MJR-SCW, 2014 WL 12683572, at *4 (S.D. Ill. Oct. 9, 2014) (declining to grant summary judgment on state law conspiracy claim and acknowledging that falsifying reports could be a tortious act under Illinois conspiracy law); *see also Fritz*, 807 N.E.2d at 470 (explaining that "[t]he allegation that Johnston did in fact file a false report with the State Police satisfies the third element, the actual commission of an overt unlawful act by one of the conspirators.").[14] Moreover,

---

[14] In other contexts, state law civil conspiracy claims have been based on cover up of evidence of torture by police officers, *e.g. Tillman v. Burge*, 813 F. Supp. 2d 946 (N.D. Ill. 2011), or in a wrongful death action, cover up of information about the hazards of asbestos exposure. *Adcock v. Brakegate, Ltd.*, 645 N.E.2d 888, 891 (Ill. 1994). By contrast, Defendants rely on cases that do not require judgment on Plaintiff's conspiracy claim. *Malek* does not support

with the merits of other claims pending, "adjudication of the conspiracy claim is best deferred until it can be addressed in tandem with plaintiffs'…excessive-force claim[]." *Gomez v. Kruger*, No. 12 C 4804, 2019 WL 3321842, at *10 (N.D. Ill. July 24, 2019).

Turning to the evidence, Plaintiff relies on the officers' deposition testimony and statements to the Independent Police Review Authority (IPRA), expert reports, and sworn testimonies of other witnesses. *See* PSOF ¶¶ 32, 33, and 34. As for Sampim, Defendants do not dispute for purposes of this motion that Sampim was not able to see whether McIntosh was armed at the time shots were fired. (Dkt. 341 at 13). Indeed the City of Chicago charged Sampim with making a false report to IPRA, among others, that he saw "a male black in a dark shirt with his arm extending with a silver pistol," before Slechter shot McIntosh, and COPA's summary of investigation gave no weight to Sampim's statements that McIntosh had a handgun and pointed it at Officer Slechter. PSOF ¶¶ 26, 27. Further, Plaintiff relies on Expert Arndt's conclusion that there was "no reasonably scientifically valid locations of Mr. McIntosh and Officer Sampim that would . . . allow for Officer Sampim to have witnessed the actions of Mr. McIntosh at the time the shots were fired." (Arndt Expert Report (Dkt. 305-11), p. 21). In light of the findings regarding Sampim's statements (and the

---

the argument that conspiracy cannot be based on a police cover-up. There, the court found that "[v]iolating rights to a marital estate is not an independent tort" for an Illinois conspiracy claim. *Malek*, No. 19 CV 8076, 2020 WL 6075871, at *11. In *Mosley v. City of Chicago*, the district court's grant of summary judgment on plaintiff's conspiracy claim was affirmed because plaintiff only "point[ed] to allegations he made in his complaint." 614 F.3d 391, 400 (7th Cir. 2010). And in *Garrit v. City of Chicago*, cited by Sampim, a single, four-word statement did not show a conspiratorial agreement on summary judgment. No. 16 C 7319, 2019 WL 5456144, at *3 (N.D. Ill. Oct. 24, 2019). Here Plaintiff is not relying on only the complaint's allegations, and she has presented circumstantial evidence to show a genuine issue of material fact exists on her conspiracy claim.

reasonable inference that he did not see McIntosh pointing a gun), a jury could reasonably question Officer Zodo's statement that he heard Sampim say "drop the gun." (Dkt. 305-14 at 10).

Plaintiff also argues that the officers lied about Zodo being present on the porch before and at the time McIntosh died and seeing McIntosh holding a gun. Zodo testified that he approached McIntosh, observed McIntosh to be conscious and ordered him to "drop the gun", which McIntosh did. (Zodo Dep. Dkt. 304-10, pp. 111-16). However, Zodo's testimonies about where he was when he heard shots fired were not consistent. He gave inconsistent statements about how far from the backyard he was and whether he was in the alley when he heard shots. At his deposition, for example, he testified that it took him approximately 15 to 25 seconds to get from his car in the alley up to the porch, and once he got there McIntosh was still conscious. (Zodo Dep., pp. 110-15). Later in his deposition he admitted that the video showed he was still on Polk, not in the alley when shots were fired. (*Id*. at pp. 145-46).

In addition, it is undisputed that the time between when McIntosh started to run and when shots were fired was less than 28 seconds (Defendants' estimation of the time frame is even shorter—24 seconds). DSOF ¶ 116. And Plaintiff's expert, Dr. Filkins opined that "Mr. McIntosh would at least have become unconscious within 5 to 15 seconds of sustaining the gunshot wound that damaged his heart." (Filkins Report at 4). Defendants' own motion states that "[t]here is no evidence that McIntosh was conscious immediately after the shooting." (Dkt. 307 at 15). Thus, a jury could determine that it would not have been possible in that short period of time for Zodo

to travel from the front of the house to the back and then up to stairs in time to find McIntosh still conscious holding a weapon.

All this demonstrates that this question is for a jury to decide—whether these officers' statements and testimony, in combination with other evidence in the record, show an agreement to cover up the shooting. *See Patrick v. City of Chicago*, 213 F. Supp. 3d 1033, 1058 (N.D. Ill. 2016) (circumstantial evidence precluded summary judgment on a conspiracy claim). Certainly, the inconsistencies could be a result of imperfect memories. But in this case Plaintiff has provided sufficient facts to survive summary judgment. It is for the jury, not this Court, to weigh the evidence and assess the credibility of the testimony. However, Plaintiff has not presented any evidence that could give rise to the inference that Defendant Bowery agreed to or engaged in any conduct in furtherance of a conspiracy. Summary judgment on this count is granted as to Defendant Bowery, and is denied as to defendants Slechter, Zodo and Sampim.

### V. Respondeat Superior and Indemnification (Counts IX and X)

Plaintiff sues the City for indemnification and *respondeat superior*. The City moved for summary judgment on these claims. [309]. Under either state-law theory, the City is liable only to the extent that its employee is liable. *See* 745 Ill. Comp. Stat. 10/9-102; *Adames v. Sheahan*, 909 N.E.2d 742, 754 (Ill. 2009). The Court denies summary judgment to the extent Plaintiff seeks to hold the City liable on the claims against Officer Slechter which the Court found survive summary judgment— excessive force, wrongful death, battery, survival and funeral expenses. The Court

also denies summary judgment to the extent Plaintiff seeks to hold the City liable on the conspiracy count against Slechter, Zodo and Sampim. The Court grants summary judgment to the City to the extent Plaintiff seeks to hold the City liable on the claims against Officer Bowery.

## VI. *Monell* Claim (Count II)

Plaintiff brings a *Monell* claim against the City alleging that the City and its police department, Superintendents, IPRA, Internal Affairs Division, Personnel Division and/or Police Board maintained interrelated de facto policies, practices, and customs, including: (1) failure to properly hire, train, supervise, discipline, transfer, monitor, counsel and/or otherwise control police officers who commit acts of excessive force; (2) a police code of silence; (3) encouragement of excessive and unreasonable force; (4) failure to properly investigate shootings of civilians; (5) failure to properly discipline, monitor, counsel and otherwise control Chicago police officers who engage in unjustified shootings; and/or (6) failure to properly train and supervise Chicago police officers with regard to discharging weapons at civilians, particularly at young Black men. The Court begins with the City's *Daubert* motion.

### A. *Daubert* Motion

The City moves this Court to bar Plaintiff's *Monell* Expert, Roger Clark, from testifying at trial and to prevent Plaintiff from relying on his opinions in opposition to summary judgment. The City argues that Clark fails to provide any independent analysis or factual basis to support his twenty-eight *Monell* opinions as required

under Rule 702 and *Daubert*. The City also argues that Clark's reports should be barred under this Court's prior orders.

Federal Rule of Evidence 702 and *Daubert* govern the admissibility of expert testimony. Rule 702 admits expert testimony if technical or specialized knowledge "will assist the trier of fact to understand the evidence or to determine a fact in issue." District courts act as gatekeepers and must ensure that expert testimony "is not only relevant, but reliable." *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147 (1999) (internal quotation marks omitted). In assessing the admissibility of expert opinions, courts do not focus on "the ultimate correctness of the expert's conclusions," *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013), but "solely on principles and methodology," *Daubert*, 509 U.S. at 595. "In assessing reliability, the role of the court is to determine whether the expert is qualified in the relevant field and to examine the methodology the expert has used in reaching his conclusions." *Timm v. Goodyear Dunlop Tires N. Am., Ltd.*, 932 F.3d 986, 993 (7th Cir. 2019) (cleaned up).

The City does not challenge Clark's qualifications, but argues that he provides no methodology and that his opinions will not assist the trier of fact. The Court agrees with the City that Clark's opinions should be barred because (1) some are untimely; (2) he makes impermissible credibility determinations; and (3) he relies on the DOJ Report without doing his own analysis.

Clark provided two expert reports in this case, one dated October 2017 and an amended report dated November 2017. Previously, this Court agreed with the City's contention that Mr. Clark's October report did not provide a sufficient basis for his

twenty-eight opinions. (Dkt. 166 at 3). When he supplemented in a November report, the Court granted Defendants' motion to bar the untimely opinions disclosed in Clark's November report, finding the newly added opinions regarding police practices (distinct from his *Monell* opinions) was due in July 2016. (*Id.*) Those non-*Monell* opinions are no longer at issue in the case. Although Plaintiff points out that the November 2017 order did not strike Clark's November report, Plaintiff also does not explain how amendments in the November report support the reliability and methodology of Clark's report under *Daubert*.

Clark's November report provides his own interpretation of what happened on August 24, 2014 and makes credibility determinations and judgments about competing evidence. This is not appropriate. *See Jordan v. City of Chicago*, No. 08 C 6902, 2012 WL 88158, at *7 (N.D. Ill. Jan. 11, 2012) (finding that expert "impermissibly dr[ew] legal conclusions based on improper credibility determinations."); *Potts v. Manos*, No. 11 C 3952, 2017 WL 4365948, at *5 (N.D. Ill. Sept. 29, 2017) (noting that the Seventh Circuit does not condone expert opinions on the proper actions of individual officers in particular situations).

Plaintiff concedes that Clark "relied on the [January 2017 U.S. Department of Justice (DOJ) Report] and other corroborating reports and their analysis of the CPD." (Dkt. 326 at 4).[15] Plaintiff's argument focuses on Clark's qualifications, but that is

---

[15] As the publicly available DOJ Report states in the Executive Summary: "On December 7, 2015, the [DOJ], Civil Rights Division, Special Litigation Section, and the United States Attorney's Office for the Northern District of Illinois, jointly initiated an investigation of the City of Chicago's Police Department (CPD) and the Independent Police Review Authority (IPRA). This investigation was undertaken to determine whether the Chicago Police

not the issue. Plaintiff also focuses on the reliability of the DOJ Report, not the reliability and methodology of *Clark's* report.[16] Indeed in this case at his deposition, Clark was asked "What are you adding to the DOJ's report []?"; he responded, "My endorsement." (Clark Dep. (Dkt. 308-1), p. 196). *See also id.*, p. 412 ("Q. Okay. All of your code of silence opinions like we discussed with the other opinion you have are essentially duplicative of what the DOJ has issued in its report? A. Yes. Q. Okay. And nothing you independently analyzed would add to those opinions? A. Only that they reflect my experience and training.").

Plaintiff does not address *Est. of Loury by Hudson v. City of Chicago*, No. 16-CV-4452, 2019 WL 1112260 (N.D. Ill. Mar. 11, 2019), a recent case in this district in which the court granted the City's motion to bar the expert opinion testimony of Mr. Clark. The court there specifically found that Clark's "qualifications alone do not make [his] opinions admissible." *Id.* at *4. In response to the same argument Plaintiff makes here, the court explained that to allow Clark to "parrot those findings [in the DOJ and PATF reports] as his own opinion about the practices of the City transforms Clark's opinion into an amplifier of those reports without adding additional value for the jury's consideration." *Id.* at *5.

For these reasons, the City's Motion to bar [308] is granted.

---

Department is engaging in a pattern or practice of unlawful conduct and, if so, what systemic deficiencies or practices within CPD, IPRA, and the City might be facilitating or causing this pattern or practice." Available at: https://www.justice.gov/opa/file/925846/download.

[16] Plaintiff relies on *Daniel v. Cook County*, 833 F.3d 728 (7th Cir. 2016) which dealt with the admissibility of a DOJ Report, and on *Dixon v. County of Cook*, 819 F.3d 343 (7th Cir. 2016), which considered a DOJ Report among other evidence on summary judgment. But neither case involved a *Daubert* challenge.

### B. *Monell* Claim

A plaintiff bringing a § 1983 claim against a municipality under *Monell* must challenge conduct that is "properly attributable to the municipality" and "that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997). *Monell* liability requires a plaintiff to "demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." *J.K.J. v. Polk Cnty.*, 960 F.3d 367, 377 (7th Cir. 2020), cert. denied sub nom. *Polk Cnty., Wisconsin v. J.K. J.*, 141 S. Ct. 1125 (2021). "The plaintiff, in short, must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.* (cleaned up).

Plaintiff argues she has sufficient evidence to support her *Monell* claim and to defeat the City's summary judgment motion. Plaintiff's *Monell* theories are: (1) failure to train; (2) failure to discipline and investigate; and (3) code of silence.

### 1. *Failure to train*

Plaintiff argues that "[t]he pattern and practice of excessive deadly force is in part a result of CPD's lack of training and supervision." (Dkt. 333 at 4). "[F]ailure-to-train (or inadequate-training) liability arises when a municipality adheres to a training program that they know or should know has failed to prevent tortious conduct by employees, thereby demonstrating deliberate indifference to this known risk." *Flores v. City of S. Bend*, No. 20-1603, 2021 WL 1903225 (7th Cir. May 12, 2021) (cleaned

up) (noting that failure-to-train liability does not require proof of widespread constitutional violations because a single violation can be sufficient where a violation occurs and the plaintiff asserts a recurring, obvious risk).

Plaintiff points specifically to the portion of the DOJ Report which states that:

> [F]oot pursuits are [] inherently dangerous and present substantial risks to officers and the public. Officers may experience fatigue or an adrenaline rush that compromises their ability to control a suspect they capture, to fire their weapons accurately, and even to make sound judgments… [CPD] does not have a foot pursuit policy. It should. In addition to not having a policy, CPD has not taken corrective action to address problematic foot pursuits. This puts officers and the public in danger and results in unreasonable uses of force. (DOJ Report (Dkt. 335-1), pp. 26-27).

The City denies the DOJ Report's conclusion but concedes that it does not have a foot pursuit policy. (Dkt. 344 at 5). Still, the City relies on *Barnes v. City of Centralia*, but that case is distinguishable because plaintiff there "neither referenced nor even alluded to *any* evidence to support *Monell* liability." 943 F.3d 826, 832 (7th Cir. 2019) (emphasis added). Here, although the Court has excluded the Clark report, Plaintiff relies on the DOJ Report, the Police Accountability Task Force (PATF) Report, the SAFER Report, and City admissions. Other courts ruling on summary judgment have found these government reports supportive of a *Monell* claim. *See Est. of Loury by Hudson*, No. 16-CV-4452, 2019 WL 1112260, at \*7 (finding that the DOJ and PATF Reports deserve considerable weight).[17] The City argues that the DOJ Report "came into existence over three years *after* McIntosh was shot and could not be the basis of

---

[17] In addition, as another court has noted, "the Seventh Circuit has held that government reports such as the DOJ Report at issue here can be admissible evidence of municipal notice relevant to a *Monell* claim." *Arrington v. City of Chicago*, No. 17 C 5345, 2018 WL 620036, at \*4 (N.D. Ill. Jan. 30, 2018).

the City policymaker's actual or constructive knowledge." (Dkt. 343 at 5). But the DOJ Report reviewed "force reports and investigative files for incidents that occurred between January 2011 and April 2016." (DOJ Report at 2). That covers the relevant time period here.

The City argues that for *Monell* liability, Plaintiff must prove its action was the "moving force" behind the constitutional violation. The causation standard is rigorous but is also "generally a question of fact for the jury to decide." *Est. of Fiebrink by Cade v. Armor Corr. Health Servs., Inc.*, No. 18-CV-832-JPS, 2019 WL 1980625, at *11 (E.D. Wis. May 3, 2019) (quoting *Shick v. Ill. Dept. of Human Servs.*, 307 F.3d 605, 615 (7th Cir. 2002)); *see also LaPorta v. City of Chicago*, 277 F. Supp. 3d 969, 985 (N.D. Ill. 2017). Here, for her lack of training theory, Plaintiff has provided enough evidence to allow a jury to resolve whether the City's lack of training regarding foot chases was the moving force behind Slechter using deadly force against McIntosh.

*2. Failure to discipline and investigate*

Plaintiff's *Monell* theory based on failure to discipline and investigate, however, does not survive summary judgment. The City argues that Plaintiff has failed to show any causal link between the lack of oversight and the alleged violation of McIntosh's constitutional rights. As the City points out, Plaintiff does not identify evidence that Slechter engaged in the use of force or misconduct that went unpunished any time before this shooting. *Cf. LaPorta*, 277 F. Supp. 3d at 989 (officer had prior instances of misconduct). Plaintiff does not show how a widespread practice of failing to investigate and discipline officers is the "moving force" in this case. *See Dean v.*

*Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021) ("This 'rigorous causation standard' requires 'a direct causal link between the challenged municipal action and the violation of [the plaintiff's] constitutional rights.'") (cleaned up); *LaPorta*, 988 F.3d at 986 ("This rigorous causation standard guards against backsliding into respondeat superior liability."). Indeed evidence that Plaintiff herself relies on, for example, for her conspiracy claim (the officers' statements to IPRA) shows there *was* investigation into the officers' conduct. The *Monell* claim based on failure to discipline and investigate cannot proceed.

### 3.  Code of silence

Finally, Plaintiff's code of silence theory survives summary judgment. Plaintiff argues that "[t]he code of silence includes: officers providing false testimony (written or oral), failing to report criminal misconduct committed by other officers or the officer himself, failing to report misconduct that violates department policies or general orders, and covering up officer misconduct." (Dkt. 333 at 5). Plaintiff relies on the DOJ Report, PATF Report and city officials' statements.

The PATF Report states that certain "statistics give real credibility to the widespread perception that there is a deeply entrenched code of silence supported not just by individual officers, but by the very institution itself," and "collective bargaining agreements between the police unions and the City have essentially turned the code of silence into official policy." (Dkts. 335-2). The DOJ Report states, among other things, that "[t]he City, police officers, and leadership within CPD and its police officer union acknowledge that a code of silence among Chicago police

officers exists, extending to lying and affirmative efforts to conceal evidence." (Dkt. 335-1).[18]

Plaintiff's *Monell* theory based on code of silence survives summary judgment because a reasonable jury could find that Slechter's decision to shoot McIntosh was caused by a belief that he would be protected from consequence because CPD tolerates a code of silence. *See LaPorta*, 277 F. Supp. 3d at 988 (finding that "the aftermath of the LaPorta shooting supports a reasonable inference that CPD officers engaged in the code of silence when interacting with [off-duty officer]."); *Est. of Loury by Hudson*, No. 16-CV-4452, 2019 WL 1112260, at *7 (finding disputes of material fact on *Monell* code of silence claim).

In sum, viewing the evidence in favor of Plaintiff, as the Court must at this stage, a reasonable juror could find that the City's failure to train officers and/or code of silence was the moving force behind McIntosh's death. The *Monell* claim on these grounds must be resolved by the jury.

## CONCLUSION

For the stated reasons, Defendant Sampim's motion for summary judgment [302] is granted in part and denied in part. Defendant Officers Bowery, Zodo, and Slechter's motion for summary judgment [303] is granted in part and denied in part. Defendant City's Motion to bar the opinions of Plaintiff's Expert [308] is granted. Defendant City's motion for summary judgment [309] is granted in part and denied in part.

---

[18] The City does not challenge the admissibility of the DOJ or PATF Reports or the Mayor's statements. *See e.g. LaPorta*, 277 F. Supp. 3d at 989 (discussing the admissibility of these reports, as well as the Mayor's acknowledgment of a code of silence).

Plaintiff has dismissed with prejudice the following claims against Officers Bowery, Zodo and Sampim: Count I (unconstitutional seizure), Count III (wrongful death), Count IV (survival), and Count V (funeral expenses). Plaintiff dismissed with prejudice Count VI (intentional infliction of emotional distress) against all the individual defendants. The Court dismisses with prejudice Count VIII (battery) against Bowery, Zodo and Sampim. The Court also dismisses with prejudice Count VII (conspiracy) against Bowery, leaving no pending claims against Bowery.

Therefore the remaining claims for trial are: the excessive force claim (Count I) against Officer Slechter; state-law claims for wrongful death, survival, funeral expenses and battery (Counts III, IV, and VIII) against Slechter; conspiracy (Count VII) against Slechter, Zodo and Sampim, and the *Monell* claim (based on lack of training regarding foot chases and code of silence) (Count II) and respondeat superior and indemnification claims (Counts IX and X) against the City.

E N T E R:

Dated: September 23, 2022

MARY M. ROWLAND
United States District Judge

32